**Samuel KORN, Plaintiff,**

v.

**LEVINE BROS. IRON WORKS CORP., and Vito A. Manzoli, Michael Levine, Louis Siegel and Archie Levine, individually and as Trustees of the Levine Bros. Iron Works Corp. Employees Pension Plan and Trust, Defendants.**

**No. 81 Civ. 6333 (KTD).**

United States District Court,
S.D. New York.

Oct. 26, 1983.

---

**8.** Defendant's Exhibit J at 2.

**9.** Transcript at 235, 269.

**10.** *Id.* at 269–70; Plaintiff's Exhibit 21.

Leonard Bailin, P.C., New York City, for plaintiff; William Seplowitz, New York City, of counsel.

Seymour Goldberg, Garden City, N.Y., and Lambert & Weiss, New York City, for defendants; Arthur N. Lambert, New York City, of counsel.

## OPINION

KEVIN THOMAS DUFFY, District Judge:

Plaintiff, Samuel Korn, brought this suit against the defendants Levine Bros. Iron Works Corporation ("Levine Bros."), Vito A. Manzoli, Michael Levine, Louis Siegel and Archie Levine, individually, and as Trustees of the Levine Bros. Iron Works Corp. Employees Pension Plan Trust (the "Plan") to recover additional pension retirement benefits. I held a bench trial in this matter on December 9th and 10th, 1982. Post-trial memoranda were fully submitted by the parties by December 29, 1982. The following shall constitute my findings of fact and law.

Samuel Korn began working for Levine Bros. in 1956. Since then Levine Bros. has engaged in structural steel erection. Korn was hired by the owner and president of the company, Archie Levine. Levine owned 100 percent of the stock until 1976 when Vito Manzoli and Michael Levine obtained approximately 5 percent of the stock. Over his first few years Korn was the supervisor in charge of the company's outside fieldwork. He arranged jobs and worker schedules, supervised initial work on projects, and monitored the progress of ongoing jobs. In addition, his duties at times included sales and the estimation of contract prices.

Effective October 1, 1962, Levine Bros. established a defined pension benefit plan in which plaintiff was a participant. Subsequently, Levine Bros. adopted a completely restated plan to accord with the statutory requirements set forth in the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.* ("ERISA"). The restated plan was effective September 1, 1976. Plaintiff initially retired from Levine Bros. on December 1, 1978. He subsequently was persuaded by Archie Levine to stay on with the company in order to train Archie's nephew. Although he agreed to put off his retirement, Korn also agreed not to participate in the pension plan during his "second" stint at Levine Bros. Accordingly, for the purposes of calculating plaintiff's retirement benefits, his entitlement must be evaluated as of his initial retirement on December 1, 1978.[1]

The 1976 Plan provided in section 3.01 that upon a participant's retirement, he

---

1. Korn finally stopped working for Levine Bros. on September 30, 1981.

was entitled (subject to a multiplier) to Monthly Retirement Income "equal to 36½ percent of his average Monthly Compensation as computed per Section 3.03 herein." Section 3.03 stated that "[a] Participant's Monthly Retirement Income shall be based on the average of the highest five consecutive years . . . ." Therefore, the determination of Korn's retirement benefits necessitates calculating thirty-six and a half percent of his average monthly income over a specified five-year period. Obviously, this requires a calculation of plaintiff's average monthly income. It is this calculation, however, that is at the heart of the parties' disagreements.

The basic issue concerns what income is to be included in determining Korn's average monthly compensation. Korn testified that when he was hired, Archie Levine told Korn that no other employee would earn as much as Korn. To ensure this, Korn's wages were tied to the level of the unionized iron workers' pay: when they got a raise, Korn got a raise. Korn received monies from Levine Bros. in two ways; he received weekly payments and he received quarterly payments. Both plaintiff and defendant agree that the weekly amounts are included in Korn's benefit calculations. Levine Bros., however, in determining plaintiff's retirement benefits, excluded the quarterly payments[2]. It is this exclusion that forms the basis of plaintiff's suit.

I. Exhaustion of Administrative Remedies

■ A preliminary issue is whether plaintiff was required and failed to make a demand upon the "Administrative Committee" designated to handle disputed claims. Defendants assert that this failure to exhaust administrative remedies requires dismissal of plaintiff's action. I disagree.

I note at the outset that nowhere does the Plan state that the demand on the Administrative Committee must be in writing. Section 9.12, though ambiguous, provides the opposite implication: "All disputed claims for benefits under the Plan shall be submitted to, and decided in writing by, one member of the Administrative Committee designated in writing by the Committee's Chairman." Furthermore, the Summary Plan Description makes the submission of even a written demand appear to be a matter of choice. Paragraph XII states that "if you become aware of a problem with your benefits you *may file* a written claim with the Administrative Committee." (Emphasis Added). In any case, even assuming a demand were required, *see Amato v. Bernard,* 618 F.2d 559 (9th Cir.1980), plaintiff made such a demand both written and oral upon the Administrative Committee.

Korn stated that at least as early as December 1980, he spoke to people who were on either the Administrative Committee or the Board of Trustees about an underpayment of his retirement benefits. According to Korn's virtually uncontradicted and certainly credible testimony, at this juncture and several times over the subsequent months, Korn was told that their accountants were or would check his benefit calculations. Even Louis Siegel, whose testimony often was less than consistent, admitted that Korn expressed his belief that the benefits were miscalculated at various informal meetings with the trustees during 1981. Finally, frustrated by the evasive answers and constant delay, plaintiff sought the assistance of an attorney. His attorneys, however, met with no better success. Nonetheless, the letters sent by his attorney were sufficient written indications of Korn's desire for the trustees to recompute his benefits, especially given the contemporaneous oral requests for the same relief. In addition, Levine Bros. is a small, closely-held company. To accept defendants' argument that plaintiff's request for a benefits' recomputation was not tech-

---

**2.** After excluding the quarterly amounts, defendants computed Korn's benefits to be $75,082.69. On January 3, 1979, Levine Bros. issued a second check for $2,244.31, for a total of $77,327.00. Plaintiff, on the other hand, has calculated his benefits by including the quarterly payments for a total of $188,302.00. The parties disagree on certain other aspects of the calculations which I also address below.

nically made would be to ignore the practical and economic realities of this small corporation's bureaucratic structure. In short, the pension plan trustees were aware of plaintiff's dispute.

In addition, the details of plaintiff's attempt to obtain relief from the company demonstrates another important point. Demand would have been futile. Even had plaintiff not made an appropriate demand upon the Administrative Committee, it would have been excusable because plaintiff would have received no redress. *See Vander Malle v. Ambach*, 673 F.2d 49, 52 (2d Cir.1982); *Baxter v. Claytor*, 652 F.2d 181, 185 (D.C.Cir.1981). Therefore, the futility of such a demand is another reason for rejecting defendants' argument. Accordingly, I turn to the merits.

**II. Compensation Included in Plaintiff's Benefit Calculation**

■ Section 1.11 of the Plan defines "Monthly Compensation" as "one-twelfth of the total annual wage or salary paid to an Employee, while a Participant in this Plan, including bonuses, overtime, and commissions." Defendants argue first that the quarterly payments were excludable "profit-sharing." I conclude, however, that the payments to Korn were at least bonuses, and thus should be included in computing plaintiff's Monthly Compensation. Defendant's characterization of the payments as excludable "profit-sharing" was arbitrary and capricious. *See Valle v. Joint Plumbing Industry Board*, 623 F.2d 196, 203 (2d Cir.1980). The reasons for this conclusion are many.

First, the circumstances surrounding the origin of the label "profit-sharing" are quite suspicious. Michael Levine, present Levine Bros. president, admitted that he first heard the term "profit-sharing" in September 1981, the same month Korn retired permanently. Vito Manzoli, the company secretary and a trustee also admitted he had not heard the term profit-sharing used previously. On September 17, 1981, plaintiff, his attorney, and the trustees met, discussed their respective understanding of plaintiff's benefit entitlement, and were unable to reach any agreement or compromise. This also was shortly after plaintiff's attorneys had demanded copies of the pension plan and the computation of plaintiff's benefits and suggested the possibility of a lawsuit. On October 15, 1981, plaintiff did institute this suit.

Second, the payments each and every calendar year, save perhaps 1976, equalled exactly $15,000. The amounts did not vary with changes in Levine Bros. profitability. This would have provided at least some objective support for defendants' use of the new term.

Third, defendants' application to the Internal Revenue Service for tax exemption qualification of the 1976 Plan stated that benefits were based on "total compensation." Plaintiff's Exh. 19, line 21(j). Plaintiff's W–2 wage statements establish, *see* Plaintiff's Exh. 8, and defendants could not deny, that the $15,000 payments clearly were part of plaintiff's total compensation. Yet, now defendants in essence assert that benefits are not based on total compensation. Defendants cannot have it one way for the IRS and another way for this court. Moreover, any other method of defining compensation would have run the risk of not receiving qualifying tax-exempt status by the IRS because it would present the potential for favoring some employees over others, *see* I.R.C. § 401(a)(4); 26 C.F.R. § 1.401–4(a)(1)(i) & 4(b) (1983), and leave benefits insufficiently determinable, *see* 26 C.F.R. § 1.401–1(b)(1)(i) (1983), both, abuses ERISA was designed to prevent.

One last factor is particularly persuasive. At trial, in the face of the strong evidence suggesting that the quarterly payments were included in the Plan's definition of Monthly Compensation, the defendants were asked to provide some relevant corporate documents. In response, they provided only summary sheets of original worksheets. Moreover, it is unclear when these summaries were prepared. After some hesitation on defendants part, they did initially produce in court with the company's original payroll and other records—two

sets in fact. Perplexingly, neither was offered into evidence. This is despite the legal requirement mandating the maintenance of such records. *See* 29 U.S.C. §§ 1027 & 1059 (1975); 29 C.F.R. § 486.1–486.5 (1983). I cannot speculate on whose position the corporate records would substantiate, but it raises additional serious questions about the origin and legitimacy of the term "profit-sharing." Accordingly, I conclude that the quarterly payments to Korn are included in the definition of Monthly Compensation. The trustees' profit-sharing argument was without any rational basis; as such it was arbitrary and capricious.

 The second question is whether the 1976 Plan's definition of Monthly Compensation applies to income received prior to that Plan's effective date. I conclude that it does. Again, defendants' contrary argument and Plan language interpretations are untenable.[3]

The 1976 Plan was a completely restated Plan, not an amendment to the earlier 1962 Plan:

WHEREAS, it is intended that this Plan and Trust be qualified and exempt under Sections 401(a) and 501(a) of the Internal Revenue Code as amended by the Employee Retirement Income Security Act of 1974,

THEREFORE, effective as of the First day of September, 1976 (hereinafter referred to as the "Effective Date") the Employer *restates* this Pension Plan and Trust for the purpose of carrying out such Plan and Trust on the following terms:

Plaintiff's Exh. 2 (emphasis added). The new Plan made no provision for carrying forward old definitions, nor did it refer to the earlier Plan for any guidance in determining benefits. By definition a Plan such

as Levine Bros.' that is restated, substitutes completely for the former plan unless contrary provision is expressly made. *Cf. J.S. & H. Construction Co. v. Richmond County Hospital Authority,* 473 F.2d 212, 215 (5th Cir.1973) (incorporation by reference is generally effective when the meaning is "clear and ascertainable").

Monthly Compensation is defined in full as:

1.11 "MONTHLY Compensation" shall mean one-twelfth of the total annual wage or salary paid to an Employee, while a Participant in this Plan, including bonuses, overtime, and commissions. For purposes of this Plan, the Monthly Compensation as of the Effective Date of the Plan, shall mean the monthly pay in effect at that time.

Defendants assert that the last clause refers to the old definition of compensation. This assertion is unsupportable. The 1962 Plan had no definition of "Monthly Compensation." Benefits were based on 1 to 3 percent of several years of "final monthly earnings," whereas here, benefits are computed by way of 36½ percent of the average Monthly Compensation. Defendants have not argued that the 1962 Plan's 1 percent and 3 percent formula is applicable in any way to a Participant retiring after the effective date of the restated Plan. In fact, defendants utilized the 1976 Plan's 36½ percent figure for the entire period in computing Korn's benefit entitlement; that includes compensation earned while the old Plan was still in force. Defendants will not be permitted to pick and choose the provisions of the old Plan it wishes to use, and those which it would like to ignore.

 In short, the applicability of a prior Plan's definition to a completely restated plan would have to be stated clearly. To permit otherwise would thrust unnecessary

---

**3.** Plaintiff argues that the quarterly payments were included in the 1962 Plan's definition of what compensation is subject to the benefit calculation, though the latter Plan's definition did exclude bonuses. Korn testified that the quarterly payments were just wages intended to ensure that his pay was in line with the union pay schedule. The only opposing interpretation 

proffered by defendants was that the payments were "profit-sharing." This last argument, as I have noted, was neither persuasive nor credible. Nevertheless, it is unnecessary to reach the conclusion that the payments were "wages" even under the 1962 Plan's definition because I find that the 1976 Plan's definition applies to the prior year's income.

ambiguity into the pension plan interpretation process, and it would encourage arbitrary and capricious conduct. *See* 26 C.F.R. § 1.401–1(b)(1)(i) (1983). If the restated Plan had intended the 1962 Plan's definition to apply, it could have stated that Monthly Compensation would be the " 'Earnings,' as defined in the 1962 Plan, in effect at that time." In any case, there is simply no explicit or implicit indication in the Levine Bros.' Plan that it intended to incorporate the 1962 Plan's definition of income for years prior to 1976.[4] Therefore, I conclude that the trustees' actions, effectively using an expired Plan's definition of compensation, were arbitrary and capricious.

## III. Benefit Computation Period

■ Section 3.03 of the Plan provides that "[a] Participant's Monthly Retirement Income shall be based on the average of the highest five consecutive years while a Participant prior to his Actual Retirement Date." Defendants assert that the five-year computation period should be calculated using the five highest consecutive Plan Years. Plan Years run from September 1 to August 31. Plaintiff, on the other hand, argues that benefits should be calculated using any five consecutive calendar years in which compensation was highest.

Plan Year is defined in section 1.14 as "the twelve-month period ending on August 31st. 'Fiscal Year of the Trust' shall be the Plan Year." Plan Year is employed by the Plan in three express instances. It is used in determining when an employee becomes eligible to participate in the Plan,

see sections 1.16, 1.22 & Article II; it is relevant to the duty to maintain an adequate level of funding to ensure future benefit payouts, *see* sections 3.05, 3.06, 5.01, 5.04, 6.02 & 8.04; and it provides the cut-off date for when the benefits actually start being paid to the retired employee, *see* sections 3.04(c) & 8.02(d). In none of the sections involving computation of benefits is there a mention of Plan Year. *See, e.g.,* sections 1.11, 1.12, 1.19, 1.25, 3.01 & 3.03. This examination of the 1976 Plan's language demonstrates that when the Plan intended the Plan Year to apply to a yearly period it did so expressly. Defendants have provided no arguable justification for using Plan Year when the section says "highest five consecutive years"; the straight forward language of the Plan mandates that the section be interpreted as it is set out: "years" means any twelve consecutive month period. The trustees' interpretation, which necessarily would result in lower benefits if an individual's income were rising was arbitrary and capricious. In plaintiff's case, his highest five consecutive years of compensation run from December 1, 1973 to November 30, 1978.[5]

## IV. Damages

### A. Benefits

■ Plaintiff is entitled first to additional benefits in the amount of $70,757.46. This was arrived at by first totalling plaintiff's five highest consecutive years of compensation:

| | |
|---|---|
| Month of December, 1973 | $ 1,533.00 [6] |
| Year of 1974 | 35,725.00 |
| Year of 1975 | 40,250.00 |

**4.** Certainly defendants have offered no objective evidence to support their position, and plaintiff has amply carried his burden of proof.

**5.** Defendants spent some time in their post-trial briefs arguing that plaintiff had not even established that he was an eligible participant on December 1, 1978 because he did not work 1000 hours between the end of the Plan Year on August 31, and December 1. *See* Defendants' Post-Trial Memorandum at 6–7. Because I rule that use of the Plan Year was arbitrary, this

argument is moot. I note, however, that the argument that plaintiff was not a Plan participant is so frivolous that it borders on bad faith, especially given defendants' other conduct.

**6.** In December 1973 plaintiff received four weekly checks of $275.00 each, totalling $1,100.00, plus a quarterly payment of $1,300.00 of which one-third, or $433.00 was earned in December. The remaining two-thirds were earned in October and November of 1973.

| | |
|---|---|
| Year of 1976 | $ 29,875.00 |
| Year of 1977 | 36,000.00 |
| Year of 1978 (through November 30th) | 42,675.00 [7] |
| TOTAL | $ 186,058.00 |

The average monthly compensation of $3,100.97 ($186,058.00 divided by 60 (months)) is multiplied by 36.5 percent per Plan section 3.01, and then by 130.834, the cash lump sum actuarial equivalent multiplier.[8] Total benefits, therefore, amount to $148,084.46. Plaintiff has received $77,-327.00 thus far.[9] Net benefits owed, accordingly, are $70,757.46.

**B. Punitive Damages**

Plaintiff argues that he is entitled to, and ERISA permits recovery of, punitive damages. Assuming, without deciding, that ERISA does permit punitive damages, I find that this is not an appropriate situation for the award of punitive damages.

Plaintiff argues that the trustees from the outset "were acting with the intent to discriminate against the plaintiff and in favor of Archie Levine, whose estate now controls 95 percent of the corporate defendant." Plaintiff's Post-Trial Memorandum at 14. Although plaintiff proved he was entitled to additional damages, he did not prove this discriminatory motive. I have on a number of occasions in this opinion found that the defendants acted arbitrarily and capriciously; nonetheless, this alone does not rise to the level of egregious conduct necessary to sustain a punitive damage claim. *See generally, Flaks v. Koegel*, 504 F.2d 702 (2d Cir.1974) ("wanton

and willful" misconduct); *In re Marine Sulphur Queen*, 460 F.2d 89 (2d Cir.1972) (gross negligence, actual malice or criminal indifference equivalent to "reckless and wanton" misconduct), *cert. denied sub nom. U.S. Fire Ins. Co. v. Marine Sulphur Transport Corp.*, 409 U.S. 982, 93 S.Ct. 318, 34 L.Ed.2d 246 (1972). Furthermore, plaintiff did not prove that defendants' overall conduct reached this level, though it was a close question. Accordingly, plaintiff's request for punitive damages is denied.

**C. Attorneys' Fees and Costs**

Plaintiff requests reasonable attorneys' fees and costs. 29 U.S.C. § 1132(g)(1) provides that "[i]n any action under this subchapter ... the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." I find that plaintiff is entitled to reasonable attorney's fees. One circuit court has outlined the following factors for a trial court to consider in deciding whether attorneys' fees are appropriate: the degree of the opposing parties' culpability or bad faith; (2) the ability of opposing parties to satisfy an award of fees; (3) whether an award of fees would deter others from acting wrongfully in similar circumstances; (4) whether claimant sought to benefit all beneficiaries of the plan or to resolve a significant legal question; and (5) the relative merits of the parties' positions. *Hum-*

---

**7.** The last payments made on December 1, 1978 were $6,000.00 and $1,500.00. These amounts obviously were earned prior to that date because plaintiff officially had terminated his employment by December 1, and did not work in December 1978. In addition, the $1,500.00 check was labeled by the defendants a "retroactive bonus." *See* Exhibit 7.

**8.** Defendants used a factor of 130.4 which represents an annuity factor. Plan section 1.31, however, states that "'Actuarial Equivalent' shall mean an amount of equivalent value, based upon a five per cent rate of interest and the 1971 Group Mortality Table." The latter figure, which is 130.834 in this case, cannot be replaced by another factor, such as the annuity factor, if its operation is to decrease benefits. *See* I.R.C. § 411(d)(6) (Supp.1983), 26 C.F.R. § 1.411(d)–

3(b) and § 1.401–1(b)(1)(i) (1983); Rev.Rul. 81–12, 1982–2 I.R.S. 10. The trustees are not permitted to have the discretion to make substitutions that lessen benefits, in order to prevent the type of abuse that gave rise to the instant case. *See also* Rev.Rul. 79–90, 1979–11 I.R.B. 8.

**9.** Plaintiff has argued that the $2,244.00 payment on January 3, 1979, *see, supra,* note 2, was not a pension benefits payment. Defendants argued at trial that they paid plaintiff that amount to appease him, and not because they believed he was owed such a pension sum. Nevertheless, it is clear from plaintiff's own testimony that defendants made the payment in answer to plaintiff's request for a reevaluation of his pension; thus I find it was a pension plan payment.

*mell v. S.E. Rykoff & Co.*, 634 F.2d 446 (9th Cir.1980).

In the instant case, defendants' conduct was certainly reprehensible. Rather than recount the numerous questionable acts previously set forth in this opinion, I cite as examples: defendants' dilatory tactics before litigation in answering plaintiff and his counsel's inquiries; this same conduct which forced me to conclude that any company/plan administrative appeal by plaintiff would have proven futile; the incredible testimony of Levine Bros.' accountant and the suspicious origin of the term "profit-sharing"; the defendants' arbitrary and capricious decisions on several issues; and, in general, conduct which led me to state that though an award of punitive damages was inappropriate, "it was a close question."

Defendants are a solvent company and have given no indication that they are unable to pay reasonable attorney's fees. In any case, this is not a determinative factor. Furthermore, an award of fees should prove to be an instructive deterrent to future conduct by parties in the defendants' positions; at least, I hope so.

This case does not necessarily confer a common benefit on all Plan participants. The only other employee who apparently receives a substantial portion of his compensation as quarterly payments is Vito Manzoli. It could be said, however, that all participants will benefit by deterring future arbitrary conduct by the defendants. In addition, my discussion concerning the relevant "highest five consecutive years" benefits all employees. Moreover, failure of an action to confer a common benefit on a group of pension plan participants is not a bar to recovery. *See Ford v. New York Central Teamsters Pension Fund*, 642 F.2d 664 (2d Cir.1981). Finally, the relative merits of the parties' positions should be clear from all that I have stated above. Attorneys' fees and costs, thus are appropriate in this case.

## IV. Conclusion

In sum, plaintiff is entitled to $70,757.46 and an award of reasonable attorney's fees and costs. Plaintiff is ordered to settle partial judgment for damages within fifteen (15) days on ten days' notice. The question of the amount of attorneys' fees can be calculated only on a proper submission, which is to be made within six weeks of the date hereof.