Charles R. McDANIEL, on behalf of himself and all others similarly situated, Plaintiff–Appellant,

v.

THE CHEVRON CORPORATION; The Chevron Corporation Pension Plan; The Chevron Corporation Retirement Plan Administrator, Defendants–Appellees.

No. 98–16363.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 13, 2000

Filed Feb. 9, 2000

Edward S. Zusman, Zelle & Larson, San Francisco, California, for the plaintiff-appellant.

Robert A. Gordon (on the briefs) and Craig E. Stewart (argued), Pillsbury Madi-

son & Sutro, San Francisco, California, for the defendants-appellees.

Edgar Pauk, Legal Services for the Elderly, New York, New York for the amicus. Mary Ellen Signorille, American Association of Retired Persons, Washington, DC, for the amicus. Paula Brantner, National Employment Lawyers Association, San Francisco, California, for the amicus.

Before: ALARCON, TASHIMA, and SILVERMAN, Circuit Judges.

ALARCON, Circuit Judge:

Charles R. McDaniel, a participant of the Chevron Corporation Retirement Plan, and a class of similarly situated plaintiffs (collectively, the "class") appeal from the district court's final order granting summary judgment in favor of the Chevron Corporation ("Chevron"), the Chevron Corporation Retirement Plan (the "Chevron Plan"), and the Chevron Corporation Retirement Plan Administrator (the "Plan Administrator").[1] The class primarily contends that the Plan Administrator violated the unambiguous requirements of the Chevron Plan in calculating the amount of retirement benefits that must be paid to participants who elect to receive actuarially equivalent benefits, including a single lump sum payment of cash. The restatement of the plan provided that those benefits would be calculated either "based on" or "in accordance with" the mortality assumptions set forth in the "UP–1984 Mortality Table." The Plan Administrator interpreted the Chevron Plan's reference to the "UP–1984 Mortality Table" as authorizing a nine month set forward to avoid understating the correct mortality assumptions due to the difference in life expectancy of males and females.

We have jurisdiction pursuant to 28 U.S.C. § 1291. We conclude that the disputed mortality assumptions, which were qualified by the words "based on" or "in accordance with," were ambiguous as used in the Chevron Plan and that the Plan Administrator did not abuse its discretion in applying a nine month set forward in calculating the mortality assumptions of participants who elected to receive actuarially equivalent forms of benefits. We affirm, because we conclude that none of the class's remaining challenges to the judgment is meritorious.

I

The Chevron Plan is a defined benefit pension plan that is governed by ERISA and tax qualified under § 401(a) of the Internal Revenue Code ("IRC"). See 29 U.S.C. § 1002(2)(A); 26 U.S.C. § 401(a). The plan's special tax qualified status allows the plan sponsor, the Chevron Corporation, to immediately deduct contributions to the plan, exempts earnings in the plan from taxation, and provides that plan participants will not be taxed on their benefits until the benefits are distributed. See 26 U.S.C. §§ 404(a), 501(a), 402(a). The Chevron Plan also allows plan participants to elect to have their benefits paid in the form of one of three types of annuities or, alternatively, in the form of a single lump sum payment of cash. Approximately ninety-five percent of the plan's participants choose to receive their benefits in a lump sum payment of cash.

The Chevron Plan calculates the amount of contributions to be made, and determines the amount of benefits that the plan must pay, by using an interest rate assumption and a mortality assumption. An interest rate assumption is used to estimate the present value of benefits to be paid in the future. A mortality assumption, which is derived from a standard mortality table, is used to estimate the probability that a person will survive, and

---

**1.** The Chevron Corporation is both the plan sponsor and the plan administrator. McDaniel's complaint incorrectly named Barbara L. Ostrom as the plan administrator. By joint stipulation, the parties dismissed the action against Ostrom without prejudice pursuant to Rule 41(a)(1) of the Federal Rules of Civil Procedure.

therefore receive benefits, to a given age. At issue in this case is whether Chevron used the correct mortality assumptions when it calculated the class members' benefits.

Actuaries prepare standard mortality tables based upon the mortality experience of a large segment of the population. *See* William W. Fellers & Paul H. Jackson *Noninsured Pensioner Mortality: The UP–1984 Mortality Table,* 25 *The Proceedings* 456, 456 (1975). In the late 1970s, Chevron began to use the UP–1984 Mortality Table for calculating the amount of contributions that it makes to the Chevron Plan. The UP–1984 Mortality Table is a "unisex" mortality table that is based on the mortality experience of a blended population that is roughly eighty percent male and twenty percent female.[2] *See id.* at 483, 485. If used without adjustment, the table is appropriate for calculating mortality assumptions for populations that have a ten percent to thirty percent female content. *See id.* For populations whose female content is either greater than thirty percent or less than ten percent, the authors of the UP 1984 Mortality Table recommend adjusting the table backward or forward a number of years to avoid overstating or understating the correct mortality assumptions.[3] *See id.*

For funding purposes, the Chevron Plan uses an all male version of the table to calculate its male benefit liabilities, and it used an all female version of the table to calculate its female benefit liabilities. Following the author's instructions, the plan's actuaries created the all male version by setting the UP–1984 Mortality Table forward one year, and they created the all female version by setting the table backward four years. *See* Fellers & Jackson, at 460, 483, 485.

■ Though the Chevron Plan uses separate, all male and all female versions of the UP–1984 Mortality Table for calculating the plan's funding obligations, federal law prohibits Chevron from using those tables when calculating the amount of benefits that it must pay to plan participants. *See Arizona Governing Comm. v. Norris,* 463 U.S. 1073, 1074, 103 S.Ct. 3492, 77 L.Ed.2d 1236 (1983); *Florida v. Long,* 487 U.S. 223, 237, 108 S.Ct. 2354, 101 L.Ed.2d 206 (1988). To comply with federal law, the Chevron Plan provides that the Plan Administrator will use a single unisex version of the UP–1984 Mortality Table when calculating actuarially equivalent benefits. The standard version of the table, which was designed for use on populations with a female content of ten to thirty percent, however, is neither valid nor appropriate for calculating those benefits. It understates the mortality assumptions of plan participants by approximately nine months (0.75 year), because the plan pays only five percent of its projected benefits to females on a dollar basis.[4] *Cf.* Fellers & Jackson,

2. The label "UP–1984" refers to the characteristics of the UP–1984 Mortality Table. The "U" denotes that the standard UP–1984 Mortality Table is a "unisex" table, which does not distinguish between the mortality assumptions for males and females of the same age. The "P" refers to "pension." The year "1984" roughly approximates the mortality improvement projection for pensioners implied by the reduction in crude mortality rates, which the authors of the table applied at ages over 65. *See* Fellers & Jackson, at 457.

3. Such an adjustment is called either a "set forward" or a "set back." A set forward is proper when a mortality table overstates the percentage of females covered be a particular plan. When a set forward occurs, the mortal-

ity table is set forward a number of years to decrease the average life expectancy of each plan participant. A set back, on the other hand, is proper when a mortality table understates the percentage of females covered by a plan. When a set back occurs, the mortality table is set back a number of years to increase the average life expectancy of each plan participant. In either case, the net effect of a proper adjustment is to treat the average plan participant as surviving only to an age that would actuarially be expected.

4. For all male populations, the authors of the UP–1984 Mortality Table recommend adjusting the standard version of the table, which is based on the mortality experience of a population that is roughly 80% male, forward one year. Because Chevron's 95% male popula-

at 460, 483, 485. As a result, the Plan Administrator has uniformly set the UP–1984 Mortality Table forward nine months when calculating actuarially equivalent benefits of plan participants.

McDaniel is a former Chevron employee and plan participant who elected to have his benefits paid in a single lump sum distribution of cash. The Plan Administrator calculated McDaniel's benefits using the UP–1984 Mortality Table with a nine month set forward and paid him roughly $49,900. Had the Plan Administrator used the UP–1984 Mortality Table without a set forward, McDaniel would have been entitled to an additional $405.

In June of 1995, McDaniel filed an administrative claim for additional benefits, contending that the Plan Administrator was required to calculate plan participants' actuarially equivalent benefits using the UP–1984 Mortality Table without a set forward. Chevron denied that claim. McDaniel appealed to Chevron's review panel. The review panel consisted of three randomly selected senior level Chevron employees, who were also plan participants. The review panel concluded that the correct interpretation of the disputed mortality assumption was the UP–1984 Mortality Table with a nine month set forward and, accordingly, denied McDaniel's claim.

McDaniel's claim prompted Chevron to conduct an internal review of the plan's mortality assumption. Concerned that the description of the mortality assumption was not sufficiently specific to qualify the plan for special tax treatment, Chevron voluntarily approached the Internal Revenue Service (the "IRS") through its anonymous Walk-in Closing Agreement Program ("CAP"). See Rev. Proc. 94–16 § 3, 1994–1 C.B. 576. The IRS reviewed the Chevron Plan and concluded that the description of the mortality assumptions for actuarially equivalent benefits presented a "form defect" that violated § 401(a)(25) of

the IRC and Revenue Ruling 79–90. The IRS found that, while Chevron had operated the plan according to its terms, it had failed to state its mortality assumptions in a manner that "precludes employer discretion." Chevron and the IRS then entered into a closing agreement under which Chevron agreed to pay a fine and to amend the plan retroactively to specify that it adjusts the UP–1984 Mortality Table forward nine months when calculating actuarially equivalent benefits.

On August 13, 1996, McDaniel filed a complaint in the district court alleging that Chevron underpaid McDaniel's benefits in violation of § 502(a) of ERISA. See 29 U.S.C. § 1132(a). He prayed for a declaration that the plan participants were entitled to have their actuarially equivalent benefits determined using the unadjusted version of the UP–1984 Mortality Table and for damages in the amount of his underpayment. The district court certified the matter as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. It defined the class to include:

> All persons who between January 1, 1984 and October 1, 1996 commenced receiving benefits from the Chevron Retirement Plan that were calculated using 85% of the UP–1984 Mortality Table with a nine-month age set forward as the mortality assumption, or the spouses, beneficiaries, executors, successors, representatives, heirs or assigns of said persons to the extent that the application of the nine-month age set forward resulted in a reduction of benefits when compared to the benefit calculated using 85% of the UP–1985 Mortality Table without a nine-month age set forward as the mortality assumption.

The parties estimate that the class consists of approximately 20,000 plan participants and that the amount in controversy is as much as $30 million.

---

tion represents three-fourths of the range from 80% to 100%, the correct set forward is

three-fourths of one year, or nine months.

After the class was certified, both sides filed cross motions for summary judgment. The class argued that it was entitled to judgment on the basis that ERISA required Chevron to pay benefits using eighty-five percent of the mortality factors set forth in the UP–1984 Mortality Table without a set forward and that Chevron's use of the UP–1984 Mortality Table with a nine-month set forward violated the anti-cutback rule in § 204(g) of ERISA. *See* 29 U.S.C. § 1054(g). Chevron argued that it had discretion to interpret the mortality assumption to include a nine-month set forward and that its interpretation was reasonable. The district court found the term "based on ... 85% of the UP–1984 Mortality Table" ambiguous.[5] It then deferred to Chevron's interpretation of the assumption and concluded that the correct mortality assumption was eighty-five percent of the mortality assumptions set forth in the UP–1984 Mortality Table with a nine-month set forward. The district court granted Chevron's motion, denied the class's motion, and entered summary judgment in favor of Chevron. We review that decision de novo. *See Balint v. Carson City*, 180 F.3d 1047, 1050 (9th Cir. 1999) (en banc).

## II

■ As a threshold matter, we must decide the proper standard for reviewing the Plan Administrator's decision to deny the class members the benefits they claim are due to them under the Chevron Plan. In so doing, we are mindful that the de novo standard of review normally applies when a court reviews a claim that a plan administrator improperly denied benefits under § 502(a)(1)(B) of ERISA. *See* 29 U.S.C. § 1132(a)(1)(B). *See Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1088–89 (9th Cir.1999) (en banc). The Supreme Court has instructed, however, that the abuse of discretion standard applies when

a pension plan confers discretionary authority on a plan administrator to construe the terms of a pension plan and to determine benefit eligibility. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). We held in *Kearney* that the presumption of de novo review can be overcome only when a plan's reservation of discretion is unambiguous. *See Kearney*, 175 F.3d at 1088–89.

■ The Chevron Plan provides that the Plan Administrator has the "sole discretion to interpret the terms of the Plan" and that those interpretations "shall be conclusive and binding." We conclude that the reservation of discretion to the Plan Administrator is sufficiently clear to overcome the presumption in favor of de novo review. *See Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 943 & n. 1 (9th Cir.1999) (applying the abuse of discretion standard where the plan stated "we have full and exclusive authority to interpret the Group Policy .... [and] any decision we make ... is conclusive and binding"); *see also, e.g., Jones v. Laborers Health & Welfare Trust Fund*, 906 F.2d 480, 481 (9th Cir. 1990) (applying the abuse of discretion standard where a plan specified that the plan administrator "shall have power ... to construe the provisions of this Trust Agreement and the Plan, and any such construction adopted ... shall be binding"). Nevertheless, the class contends that the district court should have applied a de novo standard of review because the Plan Administrator "interpreted" a federal statute or, alternatively, that it should have applied a "less deferential" standard of review because the Plan Administrator acted under a conflict of interest. We review de novo a contention that the district court did not apply the proper standard of review. *See Lang v. Long–Term*

---

5. We note that the district court did not consider whether the term "in accordance with" the UP–1984 Mortality Table is ambiguous. Nor does it appear from the record that either party addressed the issue in the proceedings

below. Because the class is defined to include those plan participants who elected actuarially equivalent benefits to be paid "in accordance with" the UP–1984 Mortality Table, we consider the question here.

*Disability Plan,* 125 F.3d 794, 797 (9th Cir.1997).

 We reject the class's argument that the de novo standard of review applies to the Plan Administrator's interpretation of the disputed language. That argument is based on a mistaken assumption that the Plan Administrator interpreted parts of ERISA or the IRC when it denied McDaniel's claim. While it is true that we cannot defer to a plan administrator's construction of a federal statute, the class has failed to demonstrate that Chevron has invaded the "province of statutory interpretation." *Arnold v. Arrow Transp. Co.,* 926 F.2d 782 (9th Cir.1991). The record shows that the Plan Administrator merely interpreted the meaning of the plan's mortality assumption when it denied McDaniel's claim. It did not interpret federal law.

 The class's alternative argument that the district court ultimately should have applied a "less deferential" standard of review lacks merit. The Supreme Court has recognized that the presence of a conflict of interest is "one factor that must be weighed in determining whether there was an abuse of discretion." *Firestone Tire & Rubber Co.,* 489 U.S. at 115, 109 S.Ct. 948. We have held that an "apparent" conflict of interest exists whenever a plan administrator is responsible for both funding and paying claims. *See Lang,* 125 F.3d at 798; *Bendixen,* 185 F.3d at 943–4; *Tremain v. Bell Indus., Inc.,* 196 F.3d 970, 976 (9th Cir.1999). Standing

alone, an apparent conflict does not affect the *ultimate* standard of review. *See Bendixen,* 185 F.3d at 943–44. It does, however, require us to look further into the plan administrator's dual role by applying the "less deference" test.[6] *See Lang,* 125 F.3d at 797–98.

 Under the "less deference" test, a plan participant must come forward with "material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self interest caused a breach of the administrator's fiduciary obligations." *Atwood v. Newmont Gold Co.,* 45 F.3d 1317, 1322–23 (9th Cir.1995) (setting forth the standard); *see also Tremain,* 196 F.3d at 976; *Bendixen,* 185 F.3d at 943. Only if the plan participant satisfies that burden does the burden of proof shift to the plan administrator to produce evidence that the apparent conflict of interest did not affect the decision to deny benefits. *See Atwood,* 45 F.3d at 1323 (stating that the plan administrator's decision is "presumptively void"). If the burden shifts and the plan administrator does not produce evidence that the apparent conflict of interest did not affect the decision to deny benefits, we will "review the decision de novo, without deference to the administrators tainted decision." *Atwood,* 45 F.3d at 1323; *see also Lang,* 125 F.3d at 797–98; *Tremain,* 196 F.3d at 977. Otherwise, we will review the plan administrator's decision under the traditional abuse of discretion standard. *See Bendixen,* 185 F.3d at 943–44; *see also*

**6.** The "less deference" test is a burden shifting test that we apply when making the determination of whether a conflict of interest is "serious." *See Atwood v. Newmont Gold Co.,* 45 F.3d 1317, 1323 (9th Cir.1995) (clarifying that the burden shifting test applies under the "less deference" standard); *Bendixen,* 185 F.3d at 943–44 (setting forth the burden shifting test as the means of determining whether a conflict is "serious"). Like the Eleventh Circuit test upon which it was modeled, it is a "two-tiered" test in that it ultimately can give rise to only a de novo standard of review or a traditional abuse of discretion standard of review. *See Atwood,* 45 F.3d at 1322 (stating that the Ninth Circuit applies a methodology

that is similar to the "two-tier" standard applied by the Eleventh Circuit); *Bendixen,* 185 F.3d at 943–44 (applying the traditional abuse of discretion standard where the conflict is only apparent); *Lang,* 125 F.3d at 797–98 (applying the de novo standard after a plan failed to carry its burden under the less deference test); *Tremain,* 196 F.3d at 977 (applying the de novo standard after a plan failed to carry its burden under the less deference test). It is not a three-tiered test that can give rise to either a de novo standard of review, a less deferential abuse of discretion standard of review, or a traditional abuse of discretion standard of review.

*Atwood,* 45 F.3d at 1322 (stating that the less deference standard is two-tiered).

In this case, the class contends that Chevron was operating under a "serious conflict" of interest when it interpreted the disputed mortality assumptions as providing for a nine-month set forward. It bases that contention on the following allegations:

 (1) Chevron was the plan sponsor and the plan administrator, and Chevron employees denied its claim;

 (2) the class's claim, if successful, will have a significant monetary impact on the plan;

 (3) the individuals who were responsible for implementing the plan's mortality assumptions influenced the review panel;

 (4) the attorneys who drafted the plan's mortality assumptions are representing Chevron in connection with this lawsuit;

 (5) Chevron did not disclose to the IRS the existence of either McDaniel's claim or the class action; and

 (6) Chevron misled McDaniel in order to delay resolution of his claim pending the outcome of the CAP process.

The class has failed to demonstrate that the Plan Administrator's interpretation of the disputed mortality assumptions was "born out of the apparent conflict of interest" that it faced while serving as both the plan sponsor and the plan administrator. *Bendixen,* 185 F.3d at 944. The review panel that denied McDaniel's claim consisted of three randomly selected Chevron employees. As plan participants, their natural self interest would be to interpret the mortality assumptions *without* a set forward. The class has not produced any material, probative evidence that the review panel was motivated by a concern that the class's claim would have a significant impact on the plan. Indeed, the class admits that neither the "overfunded" plan nor Chevron "will suffer a financial impact if . . . additional benefits are paid."

The class has also failed to present any material, probative evidence that the individuals responsible for drafting and implementing the plan's mortality assumptions, including Chevron's attorneys, influenced the review panel out of "self-interest." Those who were responsible for creating the plan's mortality assumptions did not participate in the decision making process. While they provided information to the review panel regarding their methodology, that is not sufficient to create a serious conflict of interest. The information they provided was consistent with the prior operation of the plan. *See Tremain,* 196 F.3d at 977–78 (finding that the use of two different definitions of "disability" was probative of a serious conflict); *Lang,* 125 F.3d at 798–99 (finding that inconsistent positions are evidence that a plan's decision was tainted by self interest) (citing *Brown v. Blue Cross & Blue Shield of Ala., Inc.,* 898 F.2d 1556, 1569 (11th Cir.1990)). The fact that some of the attorneys responsible for drafting the amendment may be representing Chevron in the present lawsuit is irrelevant. This action did not arise until *after* the review panel issued its decision in McDaniel's administrative proceeding.

The class's contention that Chevron purportedly misled the IRS and delayed resolution of McDaniel's claim pending the outcome of the CAP proceeding are also unsupported by the record. Chevron complied with the deadlines for handling claims. It informed McDaniel of its participation in the CAP program and disclosed to the IRS the nature of the plan's defect and that a participant had filed an administrative claim. The fact that Chevron failed to disclose to the IRS the existence of this lawsuit, which arose five months *after* the review panel denied McDaniel's claim, is irrelevant to the inquiry of whether the Plan Administrator was operating under a conflict of interest when it denied McDaniel's claim. Accordingly, the district court did not err in reviewing Chevron's interpretation of the plan's mor-

tality assumption under the traditional abuse of discretion standard.

## III

The class contends that the district court erred in concluding that the mortality assumptions were ambiguous. It argues that the reference to "UP–1984 Mortality Table" in the disputed mortality assumption plainly required Chevron to calculate benefits using the UP–1984 Mortality Table without a set forward. The class also contends that the district court failed to consider the "unique position" of class members who elected to have their actuarially equivalent benefits paid "in accordance with" eighty-five percent of the mortality assumptions set forth in the UP–1984 Mortality Table. Chevron asserts that the disputed mortality assumptions were ambiguous and that the Plan Administrator's interpretation was reasonable. It argues that the words "based on" and "in accordance with," which qualified the references to the UP–1984 Mortality Table in the disputed mortality assumptions, reasonably support an alternative interpretation that the assumptions could be calculated using the UP–1984 Mortality Table either set forward or set backward a number of months.

Whether the terms of a plan are plain or ambiguous is a question of law that we must review de novo. *See Patterson v. Hughes Aircraft Co.*, 11 F.3d 948, 950 (9th Cir.1993). We have held that terms in a pension plan should be interpreted "in an ordinary and popular sense as would a [person] of average intelligence and experience." *Richardson*, 112 F.3d at 985 (internal quotations omitted); *Vizcaino v. Microsoft Corp.*, 97 F.3d 1187, 1194 (9th Cir.1996), *modified on other grounds*, 120 F.3d 1006 (9th Cir.1997) (en banc). When disputes arise as to the meaning of one or more terms, we first look to the explicit language of the agreement to determine the clear intent of the parties. *See Richardson*, 112 F.3d at 985. "The intended meaning of even the most explicit language can, of course, only be understood in the light of the context that gave

rise to its inclusion." *Id.* An ambiguity exists when the terms or words of a pension plan are subject to more than one reasonable interpretation. *See Vizcaino*, 97 F.3d at 1194. In fact, only by excluding all alternative readings as unreasonable may we find that a plan's language is plain and unambiguous. *See Kearney*, 175 F.3d at 1090 (considering whether a conferral of discretion in a disability plan was ambiguous).

The Chevron Plan calculates actuarially equivalent benefits using mortality assumptions set forth in a standard mortality table. Actuaries prepare standard mortality tables based upon the mortality experience of a large segment of the population. *See* Fellers & Jackson, at 456. The most important consideration in preparing and selecting a mortality table to be used in calculating pension benefits is whether the population from whom the mortality experience is developed is sufficiently broad and has characteristics that are typical of the plan's participants. *See id.*

The proportion of males and females in a population is one such characteristic that is particularly important. *See id.* at 468. Because females, on average, enjoy a greater life expectancy than males, a standard mortality table that is prepared from the mortality experience of a population with a greater percentage of females than is typical of the plan will tend to understate the mortality assumption for each plan participant. For the same reason, a mortality table that is based on the mortality experience of a population with a relatively lower percentage of females will tend to overstate the mortality assumption for each plan participant. The practical effect of either understating or overstating a mortality assumption is to treat each plan participant as either surviving longer or dying earlier than should actuarially be expected. Changing the life expectancy of a plan participant, of course, can increase or decrease the amount of actuarially equivalent benefits to which he or she is entitled. It is not surprising, then, that

standard mortality tables typically recommend that the composition of males and females in the study population be adjusted in order to reflect the true gender profile of a particular plan. *See id.* at 459.

The UP–1984 Mortality Table is a standard mortality table. It was prepared using the mortality experience of a "blended" population that was roughly twenty percent female and eighty percent male and is valid for calculating the mortality assumptions for a population that is between ten percent and thirty percent female. *See* Fellers & Jackson, at 483, 485. The authors of the table instruct plan actuaries to set the table forward whenever the percentage of females participants falls below ten percent and to set the table backward whenever the percentage of female participants exceeds thirty percent. *See id.* In fact, it is common for plan actuaries to adjust the UP–1984 Mortality Table to reflect the true percentages of males and females participating in a given plan. *See id.* at 459. Some of those adjustments are reflected in regulations that have been prescribed by the Pension Benefit Guarantee Corporation.

Given that the UP–1984 Mortality Table can be, and in fact is typically, adjusted forward or backward, the exact meaning of a plan provision that incorporates the table depends on the language that describes the method in which the table is to be used. A plan provision whose language contemplates the UP–1984 Mortality Table as a starting point or as a foundation for determining mortality factors does not reasonably preclude an interpretation that sets the table forward or backward. Nor does a provision whose language provides that the plan administrator will calculate mortality factors in conformity with the methods provided for in the table itself. In each of those cases, it would be reasonable to interpret the mortality assumption either as providing for a set forward or a set back or as not providing for a set forward or a set back.

The mortality assumptions at issue in this case contemplate the possibility that the plan administrator will adjust the standard UP–1984 Mortality Table forward or backward. Though no court has defined "based on" or "in accordance with" in the context of a mortality assumption, there is ample authority to suggest that each of those phrases reasonably may be interpreted as indicating that the UP–1984 Mortality Table should be utilized as a "starting point" or a "foundation," or as providing that mortality factors will be calculated in conformity with the methods set forth in the UP–1984 Mortality Table.

In the context of statutory interpretation, courts have held that the plain meaning of "based on" is synonymous with "arising from" and ordinarily refers to a "starting point" or a "foundation." *See, e.g., Gould, Inc. v. Mitsui Min. & Smelting Co.,* 947 F.2d 218, 221 (6th Cir.1991) (stating that "based upon" as used in the Foreign Sovereign Immunities Act should be read plainly as "arising from"); *Werre v. David,* 275 Mont. 376, 913 P.2d 625, 631–32 (1996) (concluding that, under the plain meaning of "based on," a claim is "based on intentional conduct" if the intentional conduct is the starting point or the foundation for the claim); *State ex rel. Snidow v. State Bd. of Equalization,* 93 Mont. 19, 17 P.2d 68, 69–73 (1932) (holding that "gross value ... shall be determined ... based upon the average quotations" plainly meant that the gross value would be calculated using the average quotations as a "starting point"); *Nevada v. Hutchings,* 106 Nev. 453, 795 P.2d 497, 497, 501 (1990) (holding that salaries would be "set based upon" prevailing rates did not mean that salaries would be set "at" prevailing rates); *C.J.C. v. Corporation of the Catholic Bishop,* 138 Wash.2d 699, 985 P.2d 262, 267 (1999) (concluding that the plain meaning of "based on" refers to the "starting point or foundation"). We have also used the phrase "based on" in a similar manner when describing the law of ERISA. *Compare Rodrigues v. Herman,* 121 F.3d 1352, 1355 (9th Cir.1997) (stating that § 404 of ERISA is "based on the common law of trusts") *with Varity Corp. v. Howe,* 516 U.S. 489, 496, 116 S.Ct. 1065, 134 L.Ed.2d

130 (1996) (stating that fiduciaries under ERISA "draw much of their content from the common law of trusts"). That construction not only is consistent with the definition that most dictionaries attribute to the phrase, but it also reasonably supports an interpretation that the Chevron Plan allows its lump sum benefit to be calculated using a set forward or a set back so long as the standard version of the table serves as the starting point or as the foundation. *See, e.g., Webster's 3d New Int'l Dictionary* 180 (Philip Babcock Gove ed.1979) (stating that "base" means "found" and is typically used with "on" or "upon").

■■■ In further support of our conclusion, we note that the IRS also interprets mortality assumptions that are "based on" a standard mortality table either as providing for a set forward or a set back or as not providing for a set forward or a set back. Section 417(e)(3)(A)(i)(I) of the IRC provides that the applicable mortality table for calculating certain forms of mandatory distributions shall be "based on the prevailing commissioner's standard table." *Id.* Section 412(1)(7)(C)(ii)(I) of the IRC similarly provides that the mortality table for calculating certain current liabilities shall be "based on the prevailing commissioner's standard table." *Id.* The "prevailing commissioner's table" is the 1983 Group Annuity Mortality Table ("GAM 83"). *See* 26 U.S.C. § 807(d)(5)(A); Rev. Rul. 92–19, 1992–1 C.B. 227. Despite the identical language used in each section, the IRS interprets each of those mortality assumptions differently. In the first case, the IRS interprets "based on [GAM 83]" to mean the GAM 83 table weighted fifty percent for males and fifty percent for females. *See* Rev. Rul. 95–6, 1995–1 C.B. 80. In the second case, the IRS interprets "based on [GAM 83]" to mean the GAM 83 table unadjusted for males and unadjusted for females. *See* Rev. Rul. 96–7, 1996–1 C.B. 59; Rev. Rul. 95–28, 1995–1 C.B. 74. Though revenue rulings do not have the

force of law, they do constitute a body of experience and informed judgment to which we may look for guidance. *See Lucky Stores, Inc. & Subsidiaries v. Commissioner,* 153 F.3d 964, 966 n. 4 (9th Cir.1998). We see no reason why it would not also be reasonable for Chevron to interpret the plan's mortality assumptions in a similar manner.[7]

It is equally clear that the phrase "in accordance with" contemplates the fact that a standard mortality might be adjusted forward or backward. The common meaning of "accordance" is "agreement," and the phrase "in accordance with" typically refers to an instruction or rule. *See id.* (defining "in accordance with" as "in agreement with"). Because standard mortality tables provide rules for adjusting their assumptions forward or backward to reflect the percentage of females participating in a plan, the term "in accordance with" eighty-five percent of the mortality assumptions set forth in the UP–1984 Mortality Table reasonably may be interpreted as providing that mortality factors will be calculated in agreement with the authors' instructions for setting the table forward or backward. We therefore conclude that the disputed mortality assumptions were ambiguous.

The class points to evidence in the record indicating instances in which the IRS and expert actuaries do not interpret mortality assumptions that are "based on" a standard mortality table as providing for an adjustment. The fact that the IRS or expert actuaries sometimes interpret such language as not providing for a set forward does not render the disputed mortality assumptions unambiguous. Indeed, those views, while relevant, provide only one view as to how the mortality assumptions should be interpreted. To find the mortality assumptions at issue in this case unambiguous, we must exclude all other alternative constructions of the mortality assumptions as unreasonable. *See Kear-*

---

7. We recognize, of course, that Chevron does not have unfettered discretion when interpreting the plan's mortality assumptions. Any

interpretation must be reasonable. *See Bendixen,* 185 F.3d at 944.

*ney*, 175 F.3d at 1090 (finding a reservation of discretion clause ambiguous in a disability benefits plan). That we cannot do.

The class relies heavily on two district court cases, *Korn v. Levine Bros. Iron Works. Corp.*, 574 F.Supp. 836 (S.D.N.Y. 1983), and *Kiefer v. Ceridian Corp.*, 976 F.Supp. 829 (D.Minn.1997), in maintaining that the phrase "based on" does not imply a right to adjust calculations under the UP–1984 Mortality Table forward or backward. That reliance is misplaced. In *Korn*, the court merely recognized in a footnote that the plan administrator had replaced one factor with another factor. 574 F.Supp. at 843 n. 8. The court did not indicate that the plan administrator had set a specific mortality table forward or backward. Nor did it indicate whether the plan administrator was interpreting the plan when it substituted factors. *Id.* In *Kiefer*, the court simply held that an interest rate assumption was unambiguous. 976 F.Supp. at 848 (holding that "the Pension Benefit Guarantee Corporation [interest] rate" did not mean 120 percent of that rate). Unlike a standard mortality table, however, an interest rate is a specific number that cannot reasonably be interpreted as adjustable.

■■■ Because we conclude that the plan's mortality assumptions for actuarially equivalent benefits are ambiguous, our next task is to determine whether the Plan Administrator abused its discretion by interpreting those terms as providing for a nine month set forward to the UP–1984 Mortality Table. A plan administrator's decision to deny benefits must be upheld under the abuse of discretion standard if it is based upon a reasonable interpretation of the plan's terms and if it was made in good faith. *See Bendixen*, 185 F.3d at 944 (citing *Estate of Shockley v. Alyeska Pipeline Serv. Co.*, 130 F.3d 403, 405 (9th Cir. 1997)). The question we must ask is not "whose interpretation of the plan documents is most persuasive, but whether the ... interpretation is unreasonable." *Canseco v. Construction Laborers Pension Trust*, 93 F.3d 600, 606 (9th Cir.1996) (citations and internal quotations omitted). A consistent pattern of interpretation is "significant evidence" that the plan administrator acted reasonably in interpreting ambiguous plan language. *See Hansen v. Western Greyhound Retirement Plan*, 859 F.2d 779, 781 (9th Cir.1988) (upholding a consistent interpretation of an early retirement provision under the arbitrary and capricious standard); *see also* James E. Jordan et al., *Handbook on ERISA Litigation*, § 4–61 (1999 Supp.) (stating that consistency of application and interpretation are important factors in determining whether a plan administrator abused its discretion).

■■■ Chevron did not abuse its discretion when it interpreted the plan's mortality assumptions to include a nine-month set forward. The plain language of the mortality assumptions contemplates the fact that the Plan Administrator could adjust the UP–1984 Mortality Table in conformity with the authors instructions, and a nine-month set forward is the proper adjustment given Chevron's gender profile.[8] The Plan Administrator has uniformly and consistently followed those instructions when interpreting the disputed mortality assumptions. With two minor exceptions, Chevron has applied the nine-month set forward when calculating actuarially equivalent benefits for all plan participants receiving benefits since 1984.[9] In some instances, Chevron has even described the

---

8. Because Chevron's 95% male population represents three-fourths of the range from 80% to 100%, the correct set forward is three-fourths of one year, or nine months.

9. The first exception involves a table of factors that appeared from 1984–1985. That table was labeled "85% of the UP–1984 Mortality Table," but included factors derived from a different mortality table. The second exception involves a grandfathered benefit from a company that Chevron acquired. The Chevron Plan preserves existing mortality assumptions for preacquisition service and indicates that those assumptions are different from the mortality assumptions used elsewhere in the plan.

mortality assumption that it uses in its tables of factors as the UP–1984 Mortality Assumption with a nine-month set forward.[10]

Chevron's interpretation of the plan's mortality assumptions was also consistent with the plan's historical funding practices. Chevron has used the mortality factors from an all male version of the UP–1984 Mortality Table when making contributions for ninety-five percent of the plan's projected benefits, and it has used the mortality factors from an all female version of the table when making contributions for the remaining five percent of the plan's projected benefits. The same result may be achieved by making contributions for all of the plan's projected benefits using the standard version of the UP–1984 Mortality Table weighted ninety-five percent for males and five percent for females. In fact, based on the recommendations of the actuaries that developed the table, that weighting roughly corresponds to a nine month set forward. *See* Jackson & Fellers, at ·483 (stating that a one year

set forward is appropriate for plans with an all male population). The district court, therefore, properly concluded that Chevron did not abuse its discretion when it interpreted mortality assumptions as providing for a nine-month set forward to the UP–1984 Mortality Table.

## IV

Having concluded that the Plan Administrator did not abuse its discretion in interpreting the disputed mortality assumptions, we next address the class's assertion that Chevron violated certain provisions of ERISA by interpreting the Chevron Plan to permit a set forward. The class contends that we must reverse the judgment pursuant to § 204(c)(3) and § 204(g) of ERISA, if we find the plan's mortality assumptions ambiguous. The class asserts that rules prescribed under § 411 of the IRC, which are incorporated into § 204(c)(3) and § 204(g) of ERISA pursuant to § 3002(c) of ERISA,[11] pursuant to § 101 and § 104 of Reorganization Plan No. 4 of 1978,[12] and pursuant to Labor

**10.** We need not decide whether the tables of factors were part of the Chevron Plan. Nothing in the law of this circuit prohibits a plan administrator from resorting to extrinsic evidence when construing ambiguous plan provisions. *See Vizcaino,* 97 F.3d at 1194 (stating "[a]ssuming, then, that the terms of the SPP are susceptible to two reasonable interpretations and therefore are ambiguous, our next step is to determine whether the ambiguity can be resolved by resort to extrinsic evidence"); *Richardson,* 112 F.3d at 985 (stating that "a court will examine extrinsic evidence to determine the intent of the parties" when an ERISA "plan is ambiguous"). Nor does § 20(j) of the plan prevent Chevron from considering such evidence when interpreting a facially ambiguous term. Section 20(j) applies only in the event of an ambiguity "between" extrinsic information and the provisions of the plan or, alternatively, to an omission in the extrinsic information. In this case, the ambiguity is on the face of the plan, and there is no omission in the table of factors.

**11.** Section 3002(c) of ERISA provides, in pertinent part:

> (c) Extended application of regulations prescribed by Secretary of the Treasury relating to minimum participation stan-

dards, minimum vesting standards, and minimum funding standards

> Regulations prescribed by the Secretary of the Treasury under sections 410(a), 411, and 412 of Title 26 (relating to minimum participation standards, minimum vesting standards, and minimum funding standards, respectively) shall also apply to the minimum participation, vesting, and funding standards set forth in parts 2 and 3 of subtitle B of subchapter I of this chapter.

29 U.S.C. § 1202(c).

**12.** Reorganization Plan No. 4 of 1978 provides, in pertinent part:

> Section 101. Transfer to the Secretary of the Treasury
> Except as otherwise provided in Sections 104 and 106 of this Plan, all authority of the Secretary of Labor to issue the following described documents pursuant to the statutes hereinafter specified is hereby transferred to the Secretary of the Treasury:
> (a) regulations, rulings, opinions, variances and waivers under Parts 2 [section 1051 et seq. of Title 29, Labor] and 3 [section 1081 et seq. of Title 29] of Subtitle B of Title I and subsection 1012(c) [set out as a note under section 411 of Title 26] of

Regulation 2530.200a–2,[13] preclude a pension plan from specifying actuarial assumptions in a manner that allows an employer to exercise discretion. The class maintains that Chevron violated § 204(c)(3) of ERISA by calculating benefits using a nine-month set forward. It also argues that Chevron violated § 204(g) of ERISA and § 18(b) of the Chevron Plan by "illegally" reducing the class members' benefits through a 1996 amendment that specified the nine-month set forward to the UP–1984 Mortality Table. We address each argument separately.

### A

■ The applicability of the IRC to ERISA is a question of law, which we review de novo. *See Kayes v. Pacific Lumber Co.*, 51 F.3d 1449, 1455 (9th Cir. 1995). We agree that rules prescribed under § 411 of the IRC apply with equal force to § 204 of ERISA. Section 3002(c) of ERISA expressly provides that regulations prescribed under §§ 410(a), 411, and 412 of the IRC shall apply to § 204 of ERISA. *See* 29 U.S.C. § 1202(c). The Secretary of the Treasury is also given authority to issue regulations, rulings, or

Title II of the Employee Retirement Income Security Act of 1974. . . .
(b) such regulations, rulings, and opinions which are granted to the Secretary of Labor under Sections 404, 410, 411, 412, and 413 of the Internal Revenue Code of 1986, as amended [sections 404, 410, 411, 412, and 413 of Title 26, Internal Revenue Code]. . . .
Section 104. Enforcement by the Secretary of Labor
The transfers provided for in Section 101 of this Plan shall not affect the ability of the Secretary of Labor ... to engage in enforcement under Section 502 of ERISA [section 1132 of Title 29] or to exercise the authority set forth under Title III of ERISA [section 1201 et seq. of Title 29], including the ability to make interpretations necessary to engage in such enforcement or to exercise such authority. However, in bringing such actions and in exercising such authority with respect to Parts 2 [section 1051 et seq. of Title 29] and 3 [section 1081 et seq. of Title 29] of Subtitle B of Title I of ERISA and any definitions for which the authority of the Secretary of La-

opinions under § 204 of ERISA pursuant to Reorganization Plan No. 4 of 1978. *Id.* at §§ 101, 104, 43 Fed.Reg. 47713, 47713. Other circuits have interpreted that grant of authority to apply rules that are prescribed under § 411 of the IRC to their corresponding provisions in § 204 of ERISA. *See e.g. Williams v. Cordis Corp.*, 30 F.3d 1429, 1431 n. 2 (11th Cir. 1994); *Gillis v. Hoechst Celanese Corp.*, 4 F.3d 1137, 1145 (3d Cir.1993). The Department of the Treasury agrees with that interpretation, and the Department of Labor has indicated that regulations prescribed by the Secretary of the Treasury under § 411 of the IRC shall apply to § 204 of ERISA. *See* Treas. Dec. 8212, 53 Fed.Reg. 26050, 26053; 29 C.F.R. § 2530.200a–2. An agency's construction of its own regulations is entitled to substantial deference. *See Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 150, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1990) (citing *Lyng v. Payne*, 476 U.S. 926, 939, 106 S.Ct. 2333, 90 L.Ed.2d 921 (1986)).

■ We disagree, however, with the class's contention that those rules compel

bor is transferred to the Secretary of the Treasury as provided in Section 101 of this Plan, the Secretary of Labor shall be bound by the regulations, rulings, opinions, variances, and waivers issued by the Secretary of the Treasury.
43 Fed.Reg. 47713, 477713.

13. Labor Regulation 2530.200a–2 provides, in pertinent part:
Treasury regulations for purposes of the Act.
Regulations prescribed by the Secretary of the Treasury or his delegate under sections 410 and 411 of the Code (relating to minimum standards for participation and vesting) shall apply for purposes of sections 202 through 204 [29 U.S.C. § 1054] of the Act. Thus, except for those provisions (such as the definition of an hour of service or a year of service) for which authority to prescribe regulations is specifically delegated to the Secretary of Labor, regulations prescribed by the Secretary of the Treasury shall also be used to implement the related provisions contained in the Act.
29 C.F.R. § 2530.200a–2.

the conclusion that a pension plan violates § 204(c)(3) of ERISA if the description of its mortality assumptions is ambiguous. Section 411(c)(3) of the IRC is identical to § 204(c)(3) of ERISA.[14] *Compare* 26 U.S.C. § 411(c)(3) *with* 29 U.S.C. § 1054(c)(3). It provides that, in the case of a defined benefit plan, an "accrued benefit" to be paid in an "amount other than an annual benefit commencing at normal retirement age" or in a form other than in a single life annuity commencing at normal retirement age must be the "actuarial equivalent" of the "amount" or "benefit" that would commence at normal retirement age. 26 U.S.C. § 411(c)(3); *see also* 29 U.S.C. § 204(c)(3). The applicable regulation, Treasury Regulation 1.411(c)–1(e), imposes an identical requirement, except that it also authorizes the Commissioner of the IRS to determine the amount at which a benefit is the "actuarial equivalent" of a benefit that would commence at normal retirement age.[15] *See* 26 C.F.R. § 1.411(c)–1(e).

The class contends that the Commissioner has determined that the "employer discretion" standard of Revenue Ruling 79–90 must be applied under § 204(c)(3) of ERISA when a court considers whether a nontraditional benefit is the actuarial equivalent of a benefit that would commence at normal retirement age. The standard set forth in Revenue Ruling 79–90 requires actuarial assumptions, including mortality assumptions, to be "specified within the plan in a manner which precludes employer discretion" when "the amount of a benefit in a defined benefit plan is to be determined by some procedure . . . which requires the use of actuarial assumptions." [16] *Id.* In effect, the class

14. Section 411(c) of the IRC provides, in pertinent part:
 (3) Actuarial adjustment.—For purposes of this section, in the case of any defined benefit plan, if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age, or if the accrued benefit derived from contributions made by an employee is to be determined with respect to a benefit other than an annual benefit in the form of a single life annuity (without ancillary benefits) commencing at normal retirement age, the employee's accrued benefit, or the accrued benefits derived from contributions made by an employee, as the case may be, shall be the actuarial equivalent of such benefit or amount determined under paragraph (1) or (2).
 26 U.S.C. § 411(c)(3).

15. Treasury Regulation 1.411(c)–1(e) provides, in pertinent part:
 (e) Actuarial adjustments for defined benefit plans–
 (1) Accrued benefit. In the case of a defined benefit plan (as defined in section 414(j)) if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age, such benefit (determined under section 411(c)(1) and paragraph (a) of this section) shall be the actuarial equivalent of such benefit, as determined by the Commissioner.
 (2) Accrued benefit derived from employee contributions. In the case of a defined

benefit plan (as defined in section 414(j)) if the accrued benefit derived from mandatory contributions made by an employee is to be determined with respect to a benefit other than an annual benefit in the form of a single life annuity (without ancillary benefits) commencing at normal retirement age, such benefit shall be the actuarial equivalent of such benefit (determined under section 411(c)(2)(B) and paragraph (c) of this section) as determined by the Commissioner.
 26 C.F.R. § 1.411(c)–1(e).

16. Revenue Ruling 79–90 provides, in pertinent part:
 Rev. Rul. 74–385, 1974–2 C.B. 130 provides that, in the case of a defined benefit plan, the definitely determinable benefit requirement of section 1.401–1(b)(1)(i) of the regulations is satisfied where the benefits for each participant can be computed in accordance with an express formula contained in the plan that is not subject to the discretion of the employer. Whenever the amount of a benefit in a defined benefit plan is to be determined by some procedure (such as "actuarial equivalent", "actuarial reserve", or "actuarial reduction") which requires the use of actuarial assumptions (interest, mortality, etc.) the assumptions to be used must be specified within the plan in a manner which precludes employer discretion. For purposes of this revenue ruling, employer discretion includes discretion of the employer, plan administrator, fiduciary, actuary, etc.

suggests that a nontraditional benefit cannot be the actuarial equivalent of a benefit that would commence at normal retirement age unless it is expressed in a manner that precludes employer discretion. To support that contention, the class points to IRS Announcement 95–33, which, as a collateral issue, establishes procedures for testing whether a plan complies with the requirements of § 411(c)(3) of the IRC and whether a plan complies with the definitely determinable requirements of Revenue Ruling 79–90.

The class has failed to demonstrate that Revenue Ruling 79–90 applies to § 204(c)(3) of ERISA. That ruling was issued under a federal regulation that was prescribed under § 401(a) of the IRC and which required pension plans to provide "definitely determinable benefits" in order to qualify for special tax treatment. *See* 26 C.F.R. § 1.401–1(b)(1)(i) (1979). It considered "only the questions as to whether benefits are definitely determinable" under § 401(a) of the IRC. Rev. Rul. 79–90, 1971–1 C.B. 155. It therefore cannot apply to § 204(c)(3) of ERISA through § 3002(c) of ERISA, through Labor Regulation 2530.200a–2, or through § 101 and § 104 of Reorganization Plan No. 4 of 1978. Section 3002(c) of ERISA and Labor Regulation 2530.200a–2 do not incorporate rules prescribed under § 401(a). *See* 29 U.S.C. 1202(c); 29 C.F.R. § 2530.200a–2. Reorganization Plan No. 4 of 1978 incorporates only interpretations of "parallel" provisions of the IRC. *See* Reorganization Plan No. 4 of 1978, 43 Fed.Reg. 47713, 47713. Quite simply, the requirements of Revenue Ruling 79–90 do not apply to § 411(c)(3) of the IRC and are not parallel to the actuarial equivalence requirements set forth in § 204(c) of ERISA. *Compare* Rev. Rul. 79–90, 1979–1 C.B. 155 *with* 26 U.S.C. § 411(c)(3) and 29 U.S.C. § 1054(c)(3).

The class's reliance on IRS Announcement 95–33 is misplaced. In citing that announcement, the class fails to distinguish between the meaning of "definitely determinable" and the meaning of "actuarially equivalent." IRS Announcement 95–33 establishes guidelines for IRS specialists to follow in examining pension plans for "qualified joint and survivor issues and single sum distribution issues." IRS Announcement 95–33, 1995–19 I.R.B. 14. Those issues include whether "plan benefits are definitely determinable" under § 401(a)(25) of the IRC and Revenue Ruling 79–90 and whether a plan's nontraditional payment options provide an actuarially equivalent amount of benefits. *See id.* at §§ 361, 362. Contrary to the class's assertion, however, the announcement examines each of those issues separately. *Compare id.* at § 361.2 (examining plans for employer discretion under the definitely determinable requirement) *with id.* at § 362.2 (examining plans for actuarial equivalence).

The class's contention that § 204(c)(3) of ERISA incorporates the employer discretion standard of Revenue Ruling 79–90 also ignores the legislative history of ERISA. "ERISA is a comprehensive and reticulated statute which Congress has adopted after careful study of private retirement plans." *See Alessi v. Raybestos–Manhattan, Inc.,* 451 U.S. 504, 510, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981); *Hughes Salaried Retirees Action Comm. v. Administrator of Hughes Non–Bargaining Retirement Plan,* 72 F.3d 686, 696 (9th Cir.1995). Congress codified Revenue Ruling 79–90 in § 401(a)(25) of the IRC when it enacted the Retirement Equity Act of 1984. 26 U.S.C. § 401(a). Though the Retirement Equity Act incorporated a number of requirements into both the IRC and ERISA, Congress chose to incorporate the "employer discretion" standard only into § 401(a)(25) of the IRC. *See Stamper v. Total Petroleum, Inc. Retirement Plan,* 188 F.3d 1233, 1238–39 (10th Cir.1999) (noting that the Retirement Equity Act incorporated Revenue Ruling 81–12, 1981–1 C.B. 228, into both § 411(d)(6) of the IRC and § 204(g) of ERISA, but

Rev. Rul. 79–90, 1979–1 C.B. 155.

that it incorporated Revenue Ruling 79–90, 1979–1 C.B. 155, only into § 401(a) of the IRC). In light of that fact, we do not believe that Congress intended to incorporate the "employer discretion" standard into § 204(c)(3) of ERISA. *See id.* Indeed, had Congress intended the employer discretion standard of Revenue Ruling 79–90 to apply to ERISA, it would have so provided in clear and unambiguous language as it did in § 3002(c) of ERISA. *See Reklau v. Merchants Nat'l Corp.,* 808 F.2d 628, 631 (7th Cir.1986) (stating that Congress would have expressly incorporated Revenue Ruling 79–90 into ERISA had it so intended the ruling to apply); *see also* 29 U.S.C. § 1202(c) (providing that rules prescribed under §§ 410(a), 411, 412 of the IRC apply to enumerated sections of ERISA). We find no basis for concluding that an ambiguous description of a mortality assumption in a pension plan violates § 204(c)(3) of ERISA.

We also decline to accept the class's suggestion that § 204(g) of ERISA is violated merely because the description of a plan's mortality assumptions is ambiguous. Section 411(d)(6) of the IRC, which is identical to § 204(g) of ERISA, prohibits amendments to a pension plan that have the effect of either "eliminating or reducing an early retirement benefit" or "eliminating an optional form of benefit." 29 U.S.C. § 1054(g); 26 U.S.C. § 411(d)(6); *see also Gillis,* 4 F.3d at 1144 (stating that § 204(g) has a "mirror-like counterpart" in § 411(d)(6)). Treasury Regulation

1.411(d)–4, which is applicable to both sections, repeats that general rule and provides that a benefit plan's language which authorizes a plan administrator, "through the use of discretion, [to] deny a participant a § 411(d)(6) protected benefit ... violates the requirements of § 411(d)(6)." [17] 26 C.F.R. § 1.411(d)–4, Q & A 4; *see also* 26 C.F.R. § 1.411(d)–4, Q & A 5. That regulation imposes a legal duty to eliminate provisions that purport to give employers discretion to reduce an accrued benefit, and the failure to fulfill that obligation can give rise to an independent violation of § 204(g) of ERISA. *See Counts v. Kissack Water & Oil Serv., Inc.,* 986 F.2d 1322, 1325 (10th Cir.1993); *Williams,* 30 F.3d at 1431 n. 2.

Despite the class's suggestion, Treasury Regulation 1.411(d)–4 does not apply to simple ambiguities in the text of a covered plan. The legislative history of § 411(d)(6) of the IRC and § 204(g) of ERISA, under which the regulation was prescribed, indicate that neither Congress nor the Treasury Department intended the regulation to apply to ambiguous descriptions of actuarial assumptions. Congress enacted ERISA in 1974 "to promote the interests of employees and their beneficiaries in employee plans and to protect contractually defined benefits." *Williams,* 30 F.3d at 1430–31 (citing *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 113, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)) (internal quotations omitted). To further that goal,

**17.** Treasury Regulation 1.411(d)–4 provides, in pertinent part:

Except as provided in paragraph (d) of Q & A–2 of this section with respect to certain employee stock ownership plans, a plan that permits the employer, either directly or indirectly, through the exercise of discretion, to deny a participant a section 411(d)(6) protected benefit provided under the plan for which the participant is otherwise eligible (but for the employer's exercise of discretion) violates the requirements of section 411(d)(6). A plan provision that makes a section 411(d)(6) protected benefit available only to those employees as the employer may designate is within the scope of this prohibition.

For purposes of applying the rules of this section and S 1.401(a)–4, the term "employer" includes plan administrator, fiduciary, trustee, actuary, independent third party, and other persons. Thus, if a plan permits any person, other than the participant (and other than the participant's spouse), the discretion to deny or limit the availability of a section 411(d)(6) protected benefit for which the employee is otherwise eligible under the plan (but for the exercise of such discretion), such plan violates the requirements of sections 401(a), including section 411(d)(6) and, where applicable, the definitely determinable requirement of section 401(a), including section 401(a)(25).

26 C.F.R. § 1.411(d)–4, Q & A 4, Q & A 5.

Congress amended § 411(d)(6) of the IRC and § 204(g) of ERISA in 1984 in order to prevent employers from "pulling the rug out from under" plan participants by eliminating or reducing certain forms of benefits through a plan amendment. *Counts,* 986 F.2d at 1324; *see also* 26 U.S.C. § 411(d)(6); 29 U.S.C. § 1054(g); *Williams,* 30 F.3d at 1431.

Interpreting that change, the Treasury Department prescribed Treasury Regulation 1.411(d)–4. *See Williams,* 30 F.3d at 1431. In its notice of proposed rulemaking, the Treasury Department indicated that it was concerned that employers would circumvent the prohibitions in § 411(d)(6) of the IRC and § 204(g) of ERISA by eliminating or reducing benefits without formally amending the terms of a plan. *See* 51 Fed.Reg. 3798, 3798. That notice explained that, without the regulation, *"consent or discretion provisions* .... would effectively enable an employer to eliminate or reduce the availability of alternative forms of benefits without regard to the protection given plan participants under section 411(d)(6)." *Id.* (emphasis added). Given that rulemaking history, it is apparent that Treasury Department prescribed Treasury Regulation 1.411(d)–4 only to prevent plans from including specific provisions that *purport* to authorize an employer to decide which employees may receive covered benefits and in what amounts. The Treasury Department did not intend to create a system of strict liability for mere ambiguities in the text of a covered plan.

Treasury Regulation 1.411(d)–4 appears to be a direct response to a line of cases that effectively permitted plan administrators to reduce or eliminate plan participants benefits in a manner that did not require a formal plan amendment. That line of cases refused to hold plans fiduciaries liable for an illegal cutback of accrued benefits under § 204(g) of ERISA where the reduction or elimination of benefits was effected through an implementing provision · rather than through a technical amendment. None of those cases involved an ambiguous plan provision.[18] *See, e.g., Stewart v. National Shopmen Pension Fund,* 730 F.2d 1552, 1561 (D.C.Cir.1984) (refusing to find liability under § 204(g) of ERISA where a plan administrator changed benefits pursuant to a plan provision rather than an amendment); *Dooley v. American Airlines, Inc.,* 797 F.2d 1447, 1451–52 (7th Cir.1986) (refusing to a find liability under § 204(g) of ERISA where a plan administrator reduced benefits pursuant to a provision authorizing a change in actuarial assumptions "from time to time" rather than pursuant to a technical amendment); *see also., e.g., Oster v. Barco of Cal. Employees' Retirement Plan,* 869 F.2d 1215, 1216–17, 1220–21 (9th Cir.1988) (refusing to find liability where a form of benefits was denied pursuant to a provision that gave the administrator "sole discretion" to make the final determination as to the manner in which benefits are distributed).

The class cites only one case, *Korn v. Levine Bros. Iron Works Corp.,* 574 F.Supp. 836 (S.D.N.Y.1983), to support its contention that Treasury Regulation 1.411(d)–4 applies to ambiguous descriptions of mortality assumptions. *Id.* In a footnote in that case, the district court found that Revenue Ruling 81–12, the precursor to Treasury Regulation 1.411(d)–4, prohibited a plan administrator from substituting an annuity factor for an actuarial factor where the effect of the substitution was to reduce the plan participants' benefits. *See id.* at 843 n. 8; *see also* Rev. Rul. 81–12, 1981–1 C.B. 228. Though the actuarial factor in *Korn* was stated in language that is similar to the mortality assumption at issue in this case, we are not persuaded by the court's decision. The district court did not indicate in *Korn* whether the actuarial assumption was ambiguous or whether the substitution was based on an inter-

---

**18.** We note that our conclusion is also confirmed by the absence of examples of ambiguous plan provisions in the examples of "dis-

cretionary provisions" that are set forth in Treasury Regulation 1.411(d)–4. *Id.*

pretation of the plan's language. In fact, at least one court has characterized the holding in *Korn* as applying to an amendment of a plan. *See Whitaker v. Texaco Inc.*, 729 F.Supp. 845, 851 (N.D.Ga.1989) (citing *Korn*, 574 F.Supp. 836). We therefore also hold that a pension plan does not violate § 204(g) of ERISA merely because it contains an ambiguous description of a mortality assumption.

## B

■■ Section 204(c)(3) of ERISA provides that, in the case of a defined benefit plan, an "accrued benefit" to be paid in an "amount other than an annual benefit commencing at normal retirement age" or in a form other than in a single life annuity commencing at normal retirement age must be the "actuarial equivalent" of the "amount" or "benefit" that would commence at normal retirement age.[19] 29 U.S.C. § 1054(c)(3). The class and the Amici Curiae contend that the class members were paid less than the actuarial equivalent of a single life annuity, because Chevron calculated their benefits by setting the standard UP–1984 Mortality Table forward nine months. They reason that the nine-month set forward to the UP–1984 Mortality Table treats a retiree as retiring at an age that is nine months older than the retiree's chronological age.

Chevron paid the class members benefits in amounts that were the actuarial equivalent of their individual life pensions. The UP–1984 Mortality Table was prepared using the mortality experience of a population that was roughly eighty percent male and twenty percent female. *See* Jackson & Fellers, at 483, 485. It is appropriate and valid for use on plans with a ten percent to thirty percent female con-

tent. *See id.* at 460, 483, 485. That means that the standard version of the table produces actuarially correct mortality assumptions only when the proportion of females participating in a pension plan is between ten percent and thirty percent on a dollar basis. When used on a plan with a population that is less than ten percent female, however, the standard version of the table produces mortality assumptions that are understated. *See id.* at 483, 485. An understated mortality assumptions treats a person either as surviving longer than would actuarially be expected or as retiring earlier than is chronologically true.

In this case, the standard version of the UP–1984 Mortality Table is neither valid nor appropriate for use on the Chevron Plan. On a dollar basis, only five percent of the plan's benefits are paid to females. If used without a set forward, the UP–1984 Mortality Table would understate the true mortality assumption for each plan participant. That understatement would be equivalent to treating each plan participant as surviving nine months longer than should actuarially be expected or, alternatively, as retiring at an age that is nine months younger than the age at which the participant retires. According to the instructions of the authors of the UP–1984 Mortality Table, such an understatement can be corrected by setting the table forward a number of years. *See* Jackson & Fellers, at 459, 483, 485. The UP–1984 Mortality Table will produce the correct mortality assumption for each plan participant in an all male population when the table is set forward one year. *See id.* at 483, 485. Because Chevron's ninety-five percent male population represents three-

---

19. Section 204(c)(3) provides:

(3) For purposes of this section, in the case of any defined benefit plan, if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age, or if the accrued benefit derived from contributions made by an employee is to be determined with respect to a benefit other than an an-

nual benefit in the form of a single life annuity (without ancillary benefits) commencing at normal retirement age, the employee's accrued benefit, or the accrued benefits derived from contributions made by an employee, as the case may be, shall be the actuarial equivalent of such benefit or amount determined under paragraph (1) or (2).

29 U.S.C. § 1054.

fourths of the range from eighty percent to one hundred percent, the correct set forward for the Chevron Plan is three-fourths of one year, or nine months. Chevron's actuarial assumptions, though set forward nine months, therefore satisfy the requirements of § 204(c)(3) of ERISA. *See* 29 U.S.C. § 1054(c)(3).

## C

■ The class contends that Chevron violated the anticutback provisions of § 204(g) of ERISA when it calculated the class's benefits using the UP–1984 Mortality Table with a nine-month set forward.[20] It claims that the 1996 amendment, which was retroactive to 1984, decreased the class's benefits when it specified that Chevron would apply the nine-month set forward to the UP–1984 Mortality Table. The class also contends that, for the same reason, the amendment violated the anticutback provision in § 18(b) of the Chevron Plan.

Paragraph 1 of § 204(g) provides that the "accrued benefit of a participant under a plan may not be decreased by an amendment of the plan." 29 U.S.C. § 1054(c)(3). For the purpose of that paragraph, § 204(g) treats a plan amendment that "has the effect of . . . reducing an early retirement benefit or a retirement-type subsidy . . . with respect to benefits attributable to service before the amendment" as reducing an accrued benefit. 29 U.S.C.

§ 1054(g). Section 18(b) of the Chevron Plan includes a virtually identical prohibition.[21]

■ The class's argument that Chevron violated § 204(g) of ERISA and § 18(b) of the plan is meritless. Section 204(g) of ERISA applies only to formal plan amendments. It does not apply to interpretations of ambiguous plan language.[22] *See* 29 U.S.C. § 1054(g); *Richardson,* 112 F.3d at 987 (stating that § 204(g) "applies to an amendment to a Plan, *not to an interpretation of the Plan's terms* ") (emphasis added). The class has failed to demonstrate a reason for interpreting the language of § 18(b) of the Chevron Plan differently.

In this case, Chevron denied the class members' request for benefits based on its interpretation of an ambiguous description of the plan's mortality assumption. It did not rely on a formal plan amendment. In fact, the 1996 amendment, though retroactive to 1984, could not have provided the basis for calculating the class's benefits. The amendment was not executed until after Chevron interpreted the disputed mortality assumptions as providing for a nine-month set forward to the UP–1984 Mortality Table. The district court properly concluded that § 204(g) of ERISA and § 18(b) of the Chevron Plan are inapplicable to the facts of this case.

**20.** Section 204(g) provides, in pertinent part:
(g) Decrease of accrued benefits through amendment of plan
(1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(c)(8) or 1441 of this title.
(2) For purposes of paragraph (1), a plan amendment which has the effect of-
(A) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in regulations), or
(B) eliminating an optional form of benefit,
with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits. In the case of a retirement-type subsidy, the preceding sentence shall apply only with respect to a

participant who satisfies (either before or after the amendment) the preamendment conditions for the subsidy. . . .
29 U.S.C. § 1054(g).

**21.** Section 18(b) of the Chevron Plan provides, in pertinent part:
No amendment of the Plan shall (a) reduce the benefits of any Member accrued under the plan prior to the date such amendment is adopted, except to the extent such a reduction in accrued benefits may be permitted by ERISA. . . .

**22.** Chevron did not deny the class members' benefits pursuant to a provision that purports to confer discretion on the plan administrator. For that reason, Treasury Regulation 1.411(d)–4 is inapplicable.

1122

## V

We hold that the disputed mortality assumptions, which were qualified by the words "based on" or "in accordance with," were ambiguous as used in the Chevron Plan and that the Plan Administrator did not abuse its discretion in applying a nine-month set forward to the UP–1984 Mortality Table. We affirm, because we conclude that none of the class's remaining challenges to the judgment is meritorious. The judgment of the district court is AFFIRMED.