**Gail S. FRICK, a married woman, Plaintiff,**

v.

**U.S. BANCORP, and its predecessors, a foreign corporation doing business in the State of Washington, Defendant.**

**No. C99–5554 FDB.**

United States District Court,
W.D. Washington,
at Tacoma.

June 15, 2000.

---

Bruce D. Corker, Perkins Coie, Seattle, WA, for defendant.

Lane J. Wolfley, Wolfley, Hoffer & Basden, Port Angeles, WA, for plaintiff.

## ORDER GRANTING PLAINTIFF MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT MOTION FOR SUMMARY JUDGMENT

BURGESS, District Judge.

This matter comes before the Court upon the cross motions for summary judgment of Defendant U.S. Bancorp and Plaintiff Gail S. Frick, on the instant complaint by Ms. Frick challenging the Defendant's denial of severance pay benefits to her. In addition, Defendant U.S. Bancorp moves the Court to exclude Ms. Frick's affidavit testimony and attached exhibits B and D, and portions of exhibit A [DKT # 14] offered in support of plaintiff's summary judgment motion.

### Background

Ms. Frick was employed with a subsidiary of the former U.S. Bancorp as a district manager prior to its August 1, 1997, merger with First Bank System, Inc. After the merger, Ms. Frick continued to work for a subsidiary of the new U.S. Bancorp as a retail sales manager, performing essentially the same functions as before the merger. Both prior to and immediately following the merger, Ms. Frick's base salary was $64,260 annualized, or weekly $1236 ($64,260 divided by 52).

In addition to drawing her base salary, Ms. Frick participated in an incentive plan known as the 1997 Retail Branch Incentive

Plan (the "1997 Incentive Plan"). All incentive pay under the 1997 Incentive Plan was capped at a maximum 45 percent of the salary grade mid-point. Ms. Frick did not have an annual target bonus.

Effective October 1, 1997, following the merger, Ms. Frick ceased to be covered by the 1997 Incentive Plan and began participating in an incentive plan known as the Modified Retail Sales Incentive Plan (the "Interim Incentive Plan"). Under this plan, Ms. Ms. Frick could earn incentive pay again capped at 45 percent of the salary grade mid-point. Under both the 1997 Incentive Plan and the Interim Incentive Plan, Ms. Frick's maximum bonus award opportunities remained the same because she could earn up to 45 percent of the salary grade mid-point under both plans.

In January 1998, Ms. Frick ceased to be covered by the Interim Incentive Plan and began participating in an uncapped incentive plan known as the 1998 Retail Branch Group Sales Incentive Plan (the "1998 Incentive Plan"). Under the 1998 Incentive Plan, retail sales managers continued to have the opportunity to earn incentive pay, but there was no longer a 45 percent cap on the amount of incentive pay that could be earned. Most significant, the 1998 Incentive Plan also included an "earn through" component, which required Ms. Frick to earn through a certain threshold before she was eligible for severance pay. Although defendant U.S. Bancorp admits the "earn through" component changed the existing incentive structure, Defendant contends this change did not reduce Ms. Frick's annualized salary nor did it reduce her maximum bonus award opportunities. Instead Defendant asserts that Plaintiff's maximum bonus award opportunities increased under the 1998 Incentive Plan because, under this plan, there was no cap on the amount of incentive that she could be paid.

Ms. Frick voluntarily resigned from her retail sales manager position by letter dated July 16, 1998, effective August 4, 1998.

On August 18, 1998, Ms. Frick wrote a letter to Cree Z. Hanna, Senior Vice President for Human Resources and member of the Severance Administration Committee requesting severance benefits pursuant to the severance pay program of U.S. Bancorp's pension plan. Ms. Frick claimed she had resigned for "Good Reason" because she had incurred "a reduction of total compensation of over 12%" and was thus entitled to severance benefits. [Complaint Ex. D.]

By letter dated October 7, 1998, the Severance Committee informed Ms. Frick that upon review they had denied her application for severance benefits, finding there was no "Good Reason" for her resignation pursuant to the terms of the severance pay program of the pension plan.

By letter dated November 27, 1998, Ms. Frick appealed the Severance Committee's denial of severance benefits. Upon review of her appeal, the Severance Committee affirmed its previous denial of severance benefits.

On October 6, 1999, Ms. Frick filed the instant complaint in state court which subsequently was removed to federal court by Defendants who also asserted ERISA preempted her state law claims. This Court upon motion of Plaintiff remanded all state law claims to state court and maintained jurisdiction on all federal ERISA claims.

## MOTION TO EXCLUDE AFFIDAVIT TESTIMONY AND EXHIBITS OF PLAINTIFF

The Court will deny the Defendant U.S. Bancorp's motion to exclude the affidavit testimony and exhibits of plaintiff. As explained in greater detail below, the Court is required to review the decision of the pension plan administrator based on the administrative record it had before it when making its decision. The testimony and exhibits of plaintiff that are outside of the administrative record will be disregarded by the Court as such. The Court is fully

aware of the Ninth Circuit Court of Appeals finding that "(p)ermitting a district court to examine evidence outside the administrative record would open the door to the anomalous conclusion that a plan administrator abused its discretion by failing to consider evidence not before it." See *Taft v. Equitable Life Assurance Soc'y*, 9 F.3d 1469, 1472 (9th Cir.1993). Thus, Plaintiff's affidavit testimony [DKT # 14] and attached exhibits B and D, and portions of exhibit A [DKT # 14] objected to by Defendant will be disregarded by the Court but will not be stricken from the record.

### STANDARD OF REVIEW

■ Where an ERISA plan vests its administrator or fiduciary with discretion to determine eligibility for benefits and to construe the terms of the pension plan, a plaintiff's challenge to a denial of benefits, seeking enforcement of rights under the terms of plan, and a declaratory judgment of future entitlement to plan benefits is subject to an abuse of discretion review by the district court. *Firestone v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989). This is the applied standard of review regardless of whether the plan at issue is funded or unfunded and regardless of whether the administrator or fiduciary is operating under possible or actual conflict of interest. *Id.* However, where a conflict of interest exists, a "heightened" abuse of discretion standard may be applicable.

Here, U.S. Bancorp's Plan Statement provides as follows.

The Benefits Committee and any person to whom such authority has been delegated ... shall interpret and administer the terms and conditions of the Plan, decide all questions concerning the eligibility of any persons to participate in the Plan, grant or deny benefits under the Plan, construe any ambiguous provision of the Plan, correct any defect, supply any omission, or reconcile any inconsistency as the Benefits Committee or its delegatee, in its discretion, may determine ... To the extent that any determinations ... shall rate to severance benefits in the Plan, the Severance Committee shall have such authority.

[Hanna Decl., Ex. A at p. 11, § 7.1.]

Clearly, the Plan expressly gives the Severance Committee discretionary authority to determine an applicant's eligibility for severance benefits as well as to interpret the terms of the Plan. Thus, I must apply an abuse of discretion standard of review. However, the Severance Committee has an apparent conflict of interest because the members of the Severance Committee are all employees of U.S. Bancorp. But, "(s)tanding alone, an apparent conflict does not affect the ultimate standard of review." *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1108 (9th Cir.2000). Rather, a heightened abuse of discretion standard may be applicable where there is a serious conflict of interest. See *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 943 (9th Cir.1999) (citing *Atwood v. Newmont Gold Co. Inc.*, 45 F.3d 1317, 1322–23 (9th Cir.1995)).

To establish that a serious conflict exists, "the beneficiary has the burden to come forward with 'material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self-interest caused a breach of the administrator's fiduciary obligations to the beneficiary.'" *Bendixen*, 185 F.3d at 943 (quoting *Atwood*, 45 F.3d at 1323). If the beneficiary fails to satisfy this burden, then the traditional abuse of discretion review applies. But if "the beneficiary does satisfy the burden, the plan then bears the burden to show the conflict of interest did not affect the decision to deny benefits." *Id.*

■ Here, Plaintiff asserts that "(e)ven if this Court were to find a sufficient grant of discretionary authority to determine eligibility and construe the language of the Plan, the strong conflict of interest which exists in this case requires a much more

stringent standard of review, placing the burden on the defendant fiduciary to prove that its interpretation of the Plan provisions was not tainted by self-interest." [Pl.Mot.Summ.J. at 8.] Plaintiff contends that the Plan "is administered by U.S. Bancorp directly, with not a hint of an independent trustee. It is entirely unfunded. It constitutes a cost of doing business for U.S. Bancorp." [Pl.Mot.Summ.J. at 8.] Ms. Frick also asserts that "the Directors of U.S. Bancorp and the Welfare Plan are one and the same" and that the "officers of the Severance Committee are all officers of U.S. Bancorp." [Id.] Even if true, I do not see how these assertions demonstrate a serious conflict "beyond the mere fact of the apparent conflict" or tend to prove a breach of fiduciary obligation to Ms. Frick. Accordingly, I find that Ms. Frick has not come forward with material probative evidence of the Severance Committee's breach of fiduciary obligations in denying her application for severance benefits.

 Where a plan administrator gives an explanation for the denial of benefits, the question is whether it abused its discretion in construing provisions of the plan in a way that conflicts with the plain language of the plan. *Winters v. Costco Wholesale Corp.*, 49 F.3d 550, 553 (9th Cir.1995). See *Taft*, 9 F.3d at 1472–73 ("In several recent cases, we have held that ERISA plan administrators 'abuse their discretion if they render decisions without any explanation, or construe provisions of the plan in a way that conflicts with the plain language of the plan.' "). In reviewing the plan administrator's explanation for denial of benefits for an abuse of discretion, the district court must consider only the administrative record that was before the plan administrator at the time the decision was made. *Bendixen*, 185 F.3d at 944 (citing *Taft*, 9 F.3d at 1471).

Here, Defendant summarizes the Severance Committee's explanation of its denial of severance benefits to Ms. Frick as follows. "Because nothing in the Administra-

tive Record suggests that Ms. Frick resigned for 'good reason,' thereby satisfying the eligibility criteria for benefits under the terms of the Program, the Severance Administration Committee did not abuse its discretion when it denied Ms. Frick's request for benefits." [Def.Mem.Supp.Mot.Summ.J. at 17.] Therefore, in reviewing for an abuse of discretion the Severance Committee's explanation of its denial of benefits to Ms. Frick I will stay within the Administrative Record before it at the time of its determination. As averred by Ms. Cree Hannah [Cree Decl.Supp.Mot.Summ.J. at 3.], a complete copy of the Administrative Record is attached as Exhibit B to her Declaration [DKT # 11].

Significantly, "(w)here the decision to grant or deny benefits is reviewed for abuse of discretion, a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Bendixen v. Standard Ins.*, 185 F.3d 939, 942 (9th Cir.1999).

Here, I must determine if the Severance Committee abused its discretion by (1) rendering decisions without any explanation, (2) construing provisions of the plan in a way that conflicts with the plain language of the plan, or (3) relying on clearly erroneous findings of fact in making benefit determinations. See *Id.* at 944. If the Severance Committee's decision to deny plaintiff Frick severance benefits is "based upon a reasonable interpretation of the plan's terms and was made in good faith," I must uphold it. *Id.* (quoting *Estate of Shockley v. Alyeska Pipeline Serv. Co.*, 130 F.3d 403, 405 (9th Cir.1997)) (internal quotation marks omitted).

"ERISA requires a 'fiduciary' to 'discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries.' " *Varity Corp. v. Howe*, 516 U.S. 489, 506, 116 S.Ct. 1065, 1074, 134 L.Ed.2d 130 (1996). ERISA § 404(a).

Furthermore, pursuant to Section 404(a) of the Employee Retirement Income Security Act of 1974 ("ERISA"), ERISA benefit plans must be administered in accordance with the governing documents and instruments. See *Massachusetts Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 153, 105 S.Ct. 3085, 3096, 87 L.Ed.2d 96 (1985).

Here, the applicable portion of U.S. Bancorp's pension plan is undisputed by the parties and stated as follows.

*U.S. Bancorp's Middle Management Change in Control Severance Pay Program (the Severance Program)*

"Good Reason" to resign is defined in the Program at Section 1.18 in relevant part as follows.

> The occurrence of any one or more of the following events, without a Covered Employee's express written consent, within 24 months following a Partial Change in Control:
>
> (a) a reduction by the Employer in the Covered Employee's weekly base compensation(determined in accordance with Chapter 4.2 hereof) as in effect immediately prior to the Announcement Date;
>
> (b) a reduction by the Employer in the Covered Employee's annual target bonus or maximum bonus award opportunities as in effect immediately prior to the Announcement Date;
>
> (c) the employer's requiring the Covered Employee to be based at a location that is both outside the same metropolitan area of, an in excess of 30 miles from, the location of the Covered Employee's principal office immediately prior to the Announcement Date; and
>
> (d) any purported termination by the Employer of the Covered Employee's employment that is not effected pursuant to a Notice of Termination.

[Hanna Decl. ¶ 4 and Ex. A at pA6–10, § 1.18]

It is undisputed by the parties that under Section 1.18 of the Severance Program only "Good Reason" criteria (a) and (b) are at issue here, as (c) and (d) are not applicable to the instant facts. Thus, I will examine the Severance Committee's application of Section 1.18 of the Severance Program to Ms. Frick's application for severance benefits.

*Severance Committee Determination*

Defendant U.S. Bancorp contends "(a)s thoroughly explained by the Severance Administration ... (the) Committee's decision was consistent with the terms of, and in fact required by, the Program in that Ms. Frick did not satisfy any of the 'good reason' eligibility criteria for benefits." [Mem.Supp.Mot.Summ.J. at 15.]

In its October 7, 1998 letter denying Ms. Frick's request for benefits, the Severance Committee explained, in relevant part:

> "In February, 1997, your incentive plan included performance and team pool incentive components, both capped at 45% of the grade midpoint. In 1998, you changed to an uncapped "Sales Incentive Plan" with a percentage incentive payment for banker revenue over base threshold and an additional productivity accelerator. This change in incentive structures did not reduce the maximum bonus award opportunity of your compensation. Although as you note there was an earn through component to the 1998 incentive plan, the opportunity to earn incentive under the 1998 plan was better than the pre-Announcement Plan."

[10/97 Denial Letter, Complaint, Ex. E]

In its March 2, 1999 letter affirming its denial of benefits, the Severance Committee explained, in relevant part:

> Turning to the changes in incentive pay structure, as the Committee stated in its previous letter, because your former incentive arrangement was capped at 45% of grade midpoint and the new program was uncapped, you had the potential to earn more incentive under the new plan. The Committee notes that both compen-

sation plans provided you incentive pay: under the March 1997 incentive structure you were eligible for a bonus and under the 1998 incentive plan you were eligible for commission. Interpreting Section 1.18(b) of the Program, you did not receive a reduction of compensation within the Programs's meaning. This interpretation is consistent with the Program's intent of providing Good Reason when an employee's overall incentive pay opportunity is reduced, not when the incentive pay structure is changed from bonus to commission without a reduction in the overall incentive opportunity."

[3/99 Review Letter, Complaint, Ex. H.]

Thus, it is Defendant's contention that although Ms. Frick's incentive pay structure was altered, by adding an earn-through component and changing from a

bonus to commission pay structure there was absolutely no reduction in the "overall incentive opportunity." [1] I must examine the validity of this claim.

*Earn–Through Component*

In its March 2, 1999, letter to Ms. Frick, the Severance Committee stated "(w)hile the earn-through did mean that you had to reach a certain threshold before earning incentive pay, the threshold was not intended to reduce maximum bonus award opportunity relative to the prior compensation arrangement. The 1998 incentive plan in fact provided the opportunity to surpass the incentive pay under the prior compensation structure." [3/99 Review Letter, Complaint, Ex. H.]

Ken Fairchild, Retail Sales Incentive Manager for U.S. Bancorp, provided the following explanation of the earn through

---

1. The Court notes that Defendant makes a point of differentiating between the terms "bonus" and "commission." The Defendant asserts that Ms. Frick received incentive pay in the form of a "bonus" prior to the merger and with the advent of the 1998 Incentive Plan was switched to a "commission" based incentive plan. Thus, implying that Ms. Frick's incentive pay was changed in form but not in substance. Plaintiff Frick disputes the contention that she received "bonuses" instead of "commissions" prior to the merger and the 1998 Incentive Plan.

Significantly, in reviewing the Administrative Record, and the portion of the 1997 Incentive Plan contained therein, the word "bonus" is not referenced anywhere. Nor is it clearly indicated that prior to the merger a District Manager, such as Ms. Frick, received incentive pay in the form of "bonuses" as asserted by Defendants, rather than "commissions" as asserted by Ms. Frick. [Hannah Decl. p. 18–19] In fact the term "commission" is referenced repeatedly in explaining the 1997 Quarterly Team Pool Plan in which it is undisputed that Ms. Frick was a participant.

The Court notes that the Defendant's distinction between "commissions" and "bonus" has no basis other than a portion of the Administrative Record entitled, "COMDEF.DOC", a document in question and answer form, of no identifiable origin or date. Pursuant to the COMDEF.DOC of the Administrative Record, U.S. Bancorp defines "commission" as "a predetermined, proportionate

sharing of revenue arising from a discrete unit of sales. The commission can be either a flat rate or a variable rate. Commission plans can be thought of as a 'joint venture' between the sales rep and the company. Through commissions the sales rep shares in the business he/she generates." As opposed to "bonus" which it defines as "the opportunity to earn a set dollar amount, a percentage of base salary, a percentage of an award pool, or a range of pay in exchange for attaining specified results." [Hannah Decl., Ex. B, Administrative Record p. 63.]

Assuming arguendo that Defendant could substantiate the validity of the bonus and commission definitions conveniently provided in the COMDEF.DOC but nowhere else, the Administrative Record does not prove that Ms. Frick's incentive pay under the post merger 1998 Incentive Plan, termed "commissions" by Defendants, are not within the definition of bonuses. I find that the definition of "bonus" is sufficiently broad, particularly as compared to the narrower, and much more specific "commission" definition, such that the "commission" definition fits within the broader "bonus" definition, so that they could be interpreted as one and the same. Specifically, the bonus definition provides for "a range of pay in exchange for attaining specified results." I find this definition so broadly inclusive that, commissions fit within the parameters of the bonus definition. However, I am convinced Defendant's attempted distinction is not determinative of the Section 1.18(b) analysis undertaken here.

component's effect on Ms. Frick's compensation:

"The effect of the earn-through on Ms. Frick was that Ms. Frick would not earn commission until she produced sufficient revenue to earn through her base compensation in excess of $56,000. If for example, Ms. Frick produced sufficient revenue to generate $3,065 in commission in one quarter, this amount would be reduced by $2,065 (a quarter of $8,260 being the difference between $56,000 and $64,260) and therefore the amount she needed to earn through, and she would receive $1,000 in commission for that quarter. If however, Ms. Frick did not produce sufficient revenue to generate any commission or to generate a commission in excess of $2,065 quarterly, she would not receive any commission for that quarter."

[Fairchild Suppl.Decl.Supp.Def. Reply Br. Supp.Mot.Summ.J. at 3.]

Defendant contends that "the earn through component did not reduce Ms. Frick's base compensation nor did it limit her maximum bonus award opportunities. Instead, it required Ms. Frick to reach a certain threshold before earning incentive pay. This threshold was not intended to reduce, nor did it reduce, maximum bonus award opportunity relative to the prior compensation arrangement." [Def.Mem.Supp.Mot.Summ.J. at 17.]

It is clear that the earn through component acts as a condition precedent, that upon satisfaction makes Ms. Frick eligible to receive incentive pay. Significantly, this condition precedent did not exist in any form in the pre-merger 1997 Incentive Plan, or the Interim Incentive Plan. Accordingly, I must examine Defendant's assertion that the earn through component did not reduce Ms. Frick's maximum bonus award opportunities such that she had Good Reason to resign under Section 1.8(b) of the Severance Program.

*Effect on "Maximum Bonus Award Opportunities"*

Defendant U.S. Bancorp avers, "(t)his change in incentive structure did not reduce Ms. Frick's maximum bonus award opportunities. In fact, her maximum bonus award opportunities increased under the 1998 Incentive Plan because, under this plan, there was no cap on the amount of incentive that she could be paid." [Mem.Supp.Mot.Summ.J. at 3.] Thus, it is the Defendant's position that if under the 1998 Incentive Plan the likelihood of Ms. Frick becoming eligible to earn any incentive pay is reduced by imposition of an earn-through component as a condition precedent, as long as there is no cap on incentive pay it is not a reduction in maximum bonus award opportunity, i.e., no "Good Reason" to resign pursuant to the Plan.

First, I must note that oddly there is no explicit definition of "maximum bonus award opportunity" to be found in the Administrative Record [Hannah Decl., Ex. B], so apparently it is not a term of art. However, from Defendant's extensive use of the term in its pleadings it is clear that Defendant regards "maximum bonus award opportunities" as synonymous with an incentive pay cap. Applying Defendant's reasoning, at issue is the maximum amount of incentive pay that one can possibly achieve under an incentive plan, thus there is no point where a change in the minimum threshold needed to be eligible for incentive pay would effect maximum bonus award opportunities.

Extrapolating defendants' theory even further, U.S. Bancorp could change the incentive structure so that the minimum threshold, i.e., earn through component, was virtually unattainable, thus eliminating any chance that an employee in Ms. Frick's position would become eligible for incentive pay, yet as long as there was no cap on the maximum amount of incentive pay she could receive there would be no "Good Reason" to leave, and thus no eligibility for severance pay.

However, Defendant's interpretation is decidedly narrower than that expressed by the Severance Committee, in its March 2, 1999, letter to Ms. Frick, which stated "(t)he Committee notes that the Program looks at bonus 'opportunity' not actual bonus earned to determine whether an employee has Good Reason." This is hardly an express directive that opportunity refers only to the maximum amount of incentive pay Ms. Frick can earn. [3/99 Review Letter, Complaint, Ex. H.] Defendant will likely argue that the word "opportunity" is open to interpretation. However, in order to be upheld, the Defendant's interpretation must be supported by the plain language of the Severance Program pursuant to the Plan. See *Bendixen*, 185 F.3d at 944.

*Construing Plan Terms*

The Ninth Circuit Court of Appeals has stated,

" terms in a pension plan should be interpreted 'in an ordinary and popular sense as would a [person] of average intelligence and experience.' When disputes arise as to the meaning of one or more terms, we first look to the explicit language of the agreement to determine the clear intent of the parties. 'The intended meaning of even the most explicit language can, of course, only be understood in the light of the context that gave rise to its inclusion.' An ambiguity exists when the terms or words of a pension plan are subject to more than one reasonable interpretation. In fact, only by excluding all alternative readings as unreasonable may we find that a plan's language is plain and unambiguous."

*McDaniel*, 203 F.3d at 1110.

Defendant U.S. Bancorp's definition of bonus is stated in the Administrative Record as such: "(a) bonus is the *opportunity* to earn a set dollar amount, a percentage of base salary, a percentage of an award pool, or a range of pay in exchange for attaining specified results." [Hannah Decl., Ex. B, Administrative Record, p. 63] [emphasis added]. Thus, by Defendant's own definition, the term "bonus" means opportunity to earn incentive pay, whichever of three forms that it may take. Thus, the only reasonable interpretation of the term "maximum bonus award opportunity" is maximum opportunity to earn incentive pay. Clearly, it is the loss of opportunity to earn incentive pay, that is at issue here.

Here, there is no ambiguity, the Defendant's use of the word "opportunity", taken in its ordinary and popular sense, has a meaning and connotation entirely different than what Defendant asserts here. The term at issue is "maximum bonus award opportunity" and under its only reasonable interpretation Ms. Frick's opportunity to earn incentive pay awards was compromised by the change in incentive structure.

■ Accordingly, I restate the dispositive issue in this case as follows. Whether Defendant's denial of benefits pursuant to the Plan, on the finding that the imposition of an earn through component as a condition precedent to receiving incentive pay does not constitute a reduction of maximum bonus award opportunities, was an abuse of discretion? I think so.

The Defendant's failure to give ordinary and reasonable meaning to the term maximum bonus award opportunity gives rise to the unreasonable theory that the term is synonymous with an incentive pay cap. If "maximum bonus award opportunity" was to be interpreted as a term of art then logically it should have been definitively defined as such somewhere in the Administrative Record. The fact that it was not speaks volumes. In fact there is no definition in the Administrative Record that supports Defendant's interpretation. Accordingly, in the context of the Plan, the only reasonable interpretation of the term "maximum bonus award opportunity" requires the determination that Ms. Frick's maximum bonus award opportunity was reduced by the earn through component introduced after the merger.

Since, pursuant to the Severance Program, only one "Good Reason" is required to qualify for severance benefits, it is unnecessary to proceed to the entirely different analysis under Section 1.18(a) of the Severance Program of whether the earn through component affected plaintiff Frick's weekly base compensation.

### Conclusion

I reviewed the decision by U.S. Bancorp's Severance Committee to deny Plaintiff Frick's claim for severance benefits under an abuse of discretion standard. The determinative issue is whether Ms. Frick suffered a reduction in either weekly base compensation or maximum bonus award opportunities, by the Defendant's implementation of a new incentive plan requiring her to "earn through" a certain amount before becoming eligible to receive incentive pay, such that Ms. Frick had "Good Reason" to tender her resignation and was thus entitled to severance benefits under the Severance Program of U.S. Bancorp's pension plan.

Upon review of the Administrative Record of materials used by the Severance Committee to come to its determination to deny benefits, I find that defendant U.S. Bancorp's imposition of an "earn through" component changed the incentive structure, causing Ms. Frick to suffer a reduction in her maximum bonus award opportunities and giving her "Good Reason" to resign, thus entitling her to severance benefits under the Plan. Defendant's argument that its admitted change in incentive structure had no effect on Ms. Frick's opportunity to earn incentive pay is specious and unreasonable, particularly because there was no minimum threshold required of Ms. Frick prior to the post merger 1998 Incentive Plan. Accordingly, the Severance Committee's denial of Ms. Frick's appeal of defendant U.S. Bancorp's denial of severance pay was an abuse of discretion and will not be given any deference by this Court. Therefore, I must deny Defendant's motion for summary judgment and grant Summary Judgment for Ms. Frick.

Accordingly, in consideration of the parties' cross motions for summary judgment, opposition to same, the Administrative Record and the foregoing, I hereby ORDER:

A. That Defendant's Motion to Exclude Affidavit Testimony and Exhibits of Plaintiff Frick is DENIED.

B. That Defendant U.S. Bancorp's Motion For Summary Judgment is DENIED.

C. That Plaintiff Gail Frick's Motion For Summary Judgment is GRANTED.

It is so ordered.